# FEDERATED RURAL ELECTRIC INSURANCE CO., Plaintiff-Respondent-Petitioner,

v.

# William KESSLER, Defendant-Appellant,

# MADISON EQUAL OPPORTUNITIES COMMISSION, Defendant and Co-Appellant,

# CITY OF MADISON, Defendant.

Supreme Court

*No. 84-552. Argued June 4, 1986.—Decided June 20, 1986.*

(Also reported in 388 N.W.2d 553.)

For the plaintiff-respondent-petitioner there were briefs by *Frank D. Remington* and *Lee, Johnson, Kilkelly & Nichol, S.C.,* Madison, and oral argument by *Mr. Remington.*

For the defendant-appellant there was a brief by *Paul R. Soglin* and *Heibl, Heibl, Crisafi & Soglin,* Madison, and oral argument by *Paul R. Soglin.*

For the defendant and co-appellant the cause was argued by *Eunice Gibson,* assistant city attorney, with whom on the brief was *Henry A. Gempeler,* city attorney.

STEINMETZ, J. The issues in this case are: (1) whether Federated Rural Electric Insurance Company's (Federated) rule prohibiting the romantic association of any employee of one sex with a married employee of the opposite sex impermissibly discriminates on the basis of marital status. The Madison Equal Opportunities Commission concluded that the rule violated Madison's equal opportunities ordinance, and that Federated discharged Kessler "in part" because he violated the rule.

(2) If the employer's rule does impermissibly discriminate on the basis of marital status, then the issue is whether to apply the "in part" test of *Muskego-Norway C.S.J.S.D. No. 9 v. W.E.R.B.,* 35 Wis. 2d 540, 151 N.W.2d 617 (1967), to mixed motive discharges not involving anti-union animus. *Also see Employment Relations Dept. v. WERC,* 122 Wis. 2d 132, 361 N.W.2d 660 (1985). Federated urges the court to apply a different test to cases not involving antiunion animus, whereby the employer has an opportunity to prove that the employee would have been fired even without the discriminatory motive.

We conclude that Federated's rule does not discriminate on the basis of marital status, and, therefore, Kessler's termination did not violate the Madison equal opportunities ordinance even if the employer was motivated in part by Kessler's violation of the work rule. This decision is in agreement with the decision of the Dane county circuit court, Judge James C.

Boll. Because our resolution of this issue is dispositive, it is unnecessary to determine whether the "in part" test should be applied to alleged employer discrimination which does not involve antiunion animus.

On February 2, 1977, William Kessler filed a complaint with the Madison Equal Opportunities Commission. He alleged that he had been discharged by his employer, Federated, because of his marital status and physical appearance, in violation of sec. 3.23(7)(a), Madison General Ordinances.[1] As required by the ordinance, an employee of the commission investigated the complaint.

The investigator issued an initial determination on March 23, 1978, finding probable cause to believe that the ordinance had been violated. Conciliation was waived and the case was set for hearing.

Before the date set for the hearing, Federated filed a complaint for a declaratory judgment in Dane county circuit court alleging that the Madison equal opportunities ordinance was unconstitutional and requesting that the commission be enjoined from holding the hearing on Kessler's claim.

On March 12, 1979, Judge P. Charles Jones denied the requested relief, but stayed his decision pending appeal to the court of appeals. Federated appealed Judge Jones' decision to the court of appeals and that court on April 27, 1981, affirmed.

---

[1] Madison General Ordinances sec. 3.23(7)(a) provides in relevant part:

"(7) <u>Employment Practices.</u> It shall be an unfair discrimination practice and unlawful and hereby prohibited:
"(a) For any person or employer . . . to discharge any individual . . . because of such individual's . . . marital status."

The hearing examiner for the commission then held a hearing on the merits of the complaint on November 19, 1981. In the meantime, Federated had filed a petition for review of the court of appeals' decision, which this court granted. On March 26, 1982, this court affirmed the court of appeals' decision, without opinion, by an equally divided court. (Justice Abrahamson took no part.) *See* 106 Wis. 2d 767 (1982).

On October 12, 1982, the hearing examiner issued recommended findings of fact, conclusions of law determining that Federated violated the ordinance, and a recommended order for relief. Both parties filed written exceptions to the examiner's findings and conclusions. After a review hearing, the commission on March 10, 1983, modified and affirmed the recommended findings and order.

Federated then commenced this action by filing a complaint seeking certiorari review on April 5, 1983, in Dane county circuit court. The Equal Opportunities Commission filed a return on June 9, 1983. Judge Boll issued a decision and order reversing the decision of the commission and remanding the complaint to the commission for issuance of an order consistent with the court's opinion and ordering the commission to pay to Federated its costs of the action.

The commission filed an appeal and on September 10, 1985, the court of appeals, in an unpublished opinion, reversed the judgment of the trial court and reinstated the commission's decision. Federated subsequently filed a petition for review requesting this court to determine whether the "in part" test should be applied to alleged employer discrimination which does not involve antiunion animus. The court of appeals

held that the "in part" test applied to this case arising under Madison's equal opportunities ordinance.

The parties essentially only disagree as to whether the facts support an inference that Federated was motivated to discharge Kessler because he violated the employer's work rule. The historical facts are largely undisputed. In the late summer of 1975, John Bockoven, the president of Federated, contacted an employment agency for help in hiring a new claims manager. Federated is a Madison insurance company which employed about ten people in 1975. The employment agency referred William Kessler as an applicant. Bockoven interviewed Kessler and also had an industrial psychologist, Dr. John Wrage, interview him.

Bockoven hired Kessler in September, 1975. Bockoven believed that Kessler was "happily married" when he was hired. Bockoven told Kessler that "two basic ground rules" applied to his employment. Bockoven expected managers to support his decisions and "we have no fooling around with married people in our office."

Sometime in December, 1975, Bockoven learned that Kessler and his wife had separated. He immediately reminded Kessler that "because he would be single or separated from his wife, all the more reason he followed the rules of not fooling around with any married women in the office."

Around October, 1975, Bockoven's secretary, Nancy Farin, separated from her husband. Bockoven was unaware of Farin's separation until some time later; in fact, Farin and her husband attended an office party together in February, 1976. In January or February, 1976, Bockoven noticed that Kessler had lunched with Farin on two consecutive days. He immediately talked to Kessler about his concern, believing Kessler

was violating the ground rule prohibiting relationships between married coemployees. Kessler denied that any relationship existed with Farin. He said that he and Farin were friends, and that "I assure you that I'll cool it immediately."

In March or April, 1976, Bockoven discharged Farin after Farin failed to follow his instructions to prepare an annual report. At that time, Bockoven learned that Farin and her husband had separated.

In the meantime, the relationship between Kessler and Farin continued and became serious around February, 1976. Ultimately, they both became divorced and the two were married sometime in mid-1977 or thereafter.

Bockoven became concerned in August, 1976, that Kessler was setting reserves too low on open files in order to avoid discussing such files with Bockoven. Bockoven required Kessler to discuss files with reserves set above $10,000. The Wisconsin Insurance Commission prohibits setting reserves too low.

Bockoven then consulted Dr. John Hyde, another industrial psychologist, after the perceived problem with the reserves arose. Bockoven discussed with Dr. Hyde a number of complaints he had with Kessler. The purpose of the consultation was to determine whether Kessler could be "salvaged" as an employee of Federated. Dr. Hyde concluded that Bockoven's concerns focused on his lack of trust that Kessler would follow company rules. Bockoven's distrust stemmed from his perception that Kessler artificially set reserves too low; drank alcohol at lunch in violation of a company rule; misrepresented his relationship with Farin; sent out form letters and letters with strikeovers contrary to directions; and wore improper attire to work. Dr. Hyde

advised Bockoven that unless he could persuade himself to trust Kessler again, Kessler could not be "salvaged."

Shortly after consulting Dr. Hyde, Bockoven began to search for a replacement for Kessler. Bockoven discharged Kessler on December 9, 1976. Kessler then filed a complaint with the Madison Equal Opportunities Commission claiming that Bockoven impermissibly discriminated against him on the basis of physical appearance and marital status.

The commission hearing examiner concluded that Federated did violate Madison's equal opportunities ordinance. The examiner concluded that Federated discharged Kessler, in part, because of his physical appearance and marital status. The commission reviewed the examiner's factual findings, legal conclusions, and remedy, and reversed the legal conclusion that Federated discriminated on the basis of physical appearance. The commission agreed with the examiner that Federated violated the city ordinance by discharging Kessler on the basis of marital status. Kessler has not challenged in this certiorari review the commission's conclusion that Federated did not discriminate on the basis of physical appearance. Thus, the only issue in this case concerns the finding of marital status discrimination.

The examiner found as a matter of fact that Federated "had an unwritten work rule in effect during the term of Kessler's employment with Respondent that prohibited employees from associating with married employees of the opposite sex outside of work-related matters." The examiner apparently based this characterization of the rule on Bockoven's express testimony describing the rule as follows:

197

"I reminded him that because he would be single or separated from his wife, all the more reason that he followed the rules of not fooling around with any married women in the office . . . and . . . I reminded him that—of the ground rules that we had, that you don't fool with married women in the office. . . ."

Bockoven further indicated that the rule applied equally to prohibit married employees from having affairs with other married or single employees. Thus, in another instance Bockoven indicated that Kessler would violate the work rule by having an affair because he was technically married, although separated:

"Well, I was sorry that they were having difficulties, but reminded him again that our policy was one of married people don't fool with other married people in our office and as far as he was concerned, since he was still married I expected him to stay away from the clerical employees as well."

The rule quite apparently applied equally to prohibit both parties to an extramarital affair from engaging in such conduct. A single or married person could not have an affair with another married employee, and a married employee was prohibited from having an affair with another employee, whether single or married. Bockoven further amplified the purpose of the rule by stating:

"I think people generally know that, we don't want to have marital problems in the office developing from the association of the employees at the office. There is always the opportunity of people working together to develop an emotional relationship, if they pursue that, they start seeing each other away from the office on a one-on-one basis,

those things do develop, and we just say we don't want that here. It's bad for morale of the employees, it's bad for the morale of other employees, and it affects the working relationship of everyone in the office."

The examiner found that Bockoven partially relied on his perception that Kessler violated the work rule when deciding to discharge him. The examiner made the following finding:

"15. The Complainant was terminated by the Respondent on December 9, 1976. A determining factor in Respondent's decision to terminate the Complainant was Bockoven's distrust of the Complainant based on Bockoven's belief that the Complainant refused to or failed to follow his (Bockoven's) instructions. The determining factors contributing to Bockoven's distrust of the Complainant were Bockoven's beliefs that:

"(a) The Complainant had violated the work rule recited in Finding of Fact 13, above (regarding the association of any employees of one sex with married employees of the opposite sex);

"(b) The Complainant purposefully set reserves too low on some insurance claims so that he (the Complainant) would not have to discuss them with Bockoven;

"(c) The Complainant issued letters with strikeovers contrary to Bockoven's instructions;

"(d) The Complainant drank alcohol on his lunch hour and encouraged other employees to drink alcohol on their lunch hours;

"(e) The Complainant did not come to work wearing the manner of dress Bockoven requested he should."

199

The examiner concluded from the above finding that Federated discriminated on the basis of marital status. The examiner explained this conclusion in his memorandum opinion. He stated without discussion that the work rule discriminated on its face on the basis of marital status. Furthermore, violation of the rule was a "residual" factor in the discharge decision because it affected the employer's trust in Kessler. The examiner considered dismissal based on distrust which is caused by violation of a discriminatory policy to be "in actuality no different and no less discriminatory than relying on the policy itself." The examiner analogized this work rule to a rule prohibiting white employees from associating with black employees of the opposite sex, a policy which the examiner stated would be clearly discriminatory.

Finally, the examiner concluded that an employer violates the ordinance when it discharges in part on the basis of a discriminatory motive. He concluded the discriminatory motive does not have to be *the* determining factor in a discharge. Based on his analysis that Federated was motivated in part by the perception that Kessler violated the discriminatory marital status rule, the examiner concluded that Federated violated the equal opportunities ordinance.

The Madison Equal Opportunities Commission affirmed the examiner's conclusion that Federated discriminated on the basis of marital status. The commission agreed, without discussion, with the examiner's reasoning on the marital status issue. Federated then commenced certiorari review of the commission's final decision and order in the circuit court.

The circuit court reversed the commission's decision. The court concluded that Federated's work rule

did not discriminate on the basis of marital status because the rule applied evenly to both married and single persons involved in extramarital affairs with coemployees. The court specifically stated:

"The work rule, as stated in Finding No. 13, was not discriminatory as applied to Mr. Kessler. The rule applied to all employees, regardless of their marital status. Whether Mr. Kessler had been married, separated, divorced, widowed, or single, he would have been equally prohibited by the rule from developing a romantic relationship with a fellow employee who was married. The work rule was thus a regulation of Mr. Kessler's *conduct,* rather than a discrimination based on his marital status. The only conclusion possible from these facts is that Mr. Kessler's marital status was irrelevant to his discharge. Thus, the employer did not violate Mad. Gen. Ord. 3.23(7)(a)."

The court agreed, however, that the rule does establish different standards of permissible conduct for married and unmarried employees. The court stated that:

"The rule, in essence, prevents all employees from pursuing romances with fellow employees who are married, while not preventing any employees from pursuing romances with unmarried coworkers . . . The rule, by preventing all employees from being involved in romances with married coworkers, thereby prevents all married employees from having romances with any coworkers, while it does not prevent unmarried employees from having romances with any coworkers. The rule thus creates two groups, married and unmarried employees, and the two groups have different abilities with regard to romances with coworkers. Although

the rule does not, as such, have an effect on the conduct of the occupants of the two groups, the enforcement of the rule would cut off the access of the married employees to romances with coworkers."

The court thus recognized that the impact of the work rule affects married and single persons differently: married persons cannot have any relationships with coemployees married or single, but single persons can have relationships with other single employees. Nonetheless, the court concluded that the rule did not violate the Madison equal opportunities ordinance because:

"The commission apparently failed to realize that not every policy which categorizes employees based on their status or membership in a group is illegally discriminatory. Rather, illegal discrimination is a categorization which results, because of the categorization, in the loss by an individual of a legally protected right or privilege. *See* Mad. Gen. Ord. 3.23(1). In the instant case of employment practices and marital status, illegal discrimination consists of an employer basing hiring or discharge decisions on an individual's marital status (Mad. Gen. Ord. 3.23(7) (a)), or of an employer classifying employees by marital status in a way 'which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his or her status as an employee . . .' (Mad. Gen. Ord. 3.23(7)(b))."

The court concluded that the rule does not "adversely affect . . . status as an employee" because the right to engage in an extramarital affair is not a legally protected right, and because prohibiting married employees from having affairs does not socially stigmatize

or create a class of second class employees. The court stated:

> "Preventing married employees from having romances with coworkers does not tend to stigmatize them or to make them second class employees. It should be remembered that one of the socially recognized purposes of marriage is to establish an exclusive sexual bond with one's spouse. Thus, a married person is not stigmatized by an expectation that he or she will maintain a monogamous relationship with his or her spouse for as long as he or she chooses to remain in the marital state. The ability of a married employee to pursue a romantic relationship with a coworker who is not his or her spouse is thus not a legally protected right or privilege, and the denial of that ability is not a denial of equal opportunity in employment."

The circuit court further noted that Federated's rule is clearly consistent with public policy. The rule promotes the institution of marriage by prohibiting extramarital affairs, consistent with sec. 765.001(2), Stats., which states that marriage is "the institution that is the foundation of the family and of society."

Finally, the court considered that the rule helps enforce Madison's antisexual harassment ordinance, Madison General Ordinances 3.23(7)(k). The court stated:

> "Finally, it should be noted that Mad. Gen. Ord. 3.23(7)(k) requires that 'employers shall ensure that all of their employees work in an environment free of sexual harassment.' The same ordinance section holds employers presumptively responsible for all acts of sexual harassment committed by their agents and supervisory personnel. Thus, employers

are required by this section to institute procedures and policies designed to prevent incidents of sexual harassment. As noted above, persons who choose to enter the marital state are generally considered to be expressing a preference for a sexually monogamous relationship with their spouse. Thus, the work rule is consistent with the sexual harassment ordinance, because it is not unreasonable for an employer to believe that married persons are generally not desirous of being subjected to romantic advances from persons other than their spouse, and it is not unreasonable for an employer to believe that such advances, sanctioned by the employer, could be presumptively considered to be sexual harassment."

Kessler appealed the circuit court's decision to the court of appeals. The court of appeals concluded that Federated did base its decision to discharge Kessler, in part, on his violation of the work rule. The court held that such "in part" motivation was sufficient to violate the equal opportunities ordinance. Finally, the court ruled that the work rule discriminated on the basis of marital status because it only prohibited single employees from having relationships with married persons and did not prohibit married persons from being involved in extramarital affairs. The court apparently relied on a misperception of the rule in reaching its conclusion that the rule only applied to single employees. The court specifically stated:

"The commission's conclusion that Federated discriminated against Kessler on the basis of his marital status was reasonable. Federated's rule discriminated against Kessler because it was one-sided. The rule failed to restrict social associations both by and with married employees. As phrased by

204

the employer, the rule prohibits a single employee from associations with a married employee. In other words, if any married employee associated with a single employee, the married employee would not be violating the rule while the single employee would. It is this arbitrary distinction that invalidates the rule. The trial court erroneously stated that the rule applied to all employees regardless of marital status. If the rule applied equally to all employees, we would reach a different conclusion."

The case therefore reaches this court after decisions by three levels of decisionmakers. None of the decisions uses the same analysis to determine the legality of Federated's work rule. Moreover, marital status discrimination presents an issue which this court has never substantively addressed. However, Federated only petitioned for review of the applicability of the "in part" test to cases not involving antiunion animus. Nonetheless, this court acquired jurisdiction of the entire appeal by Federated's timely petition for review, and we did not expressly limit the issues when we granted the petition. *See State v. Rhone*, 94 Wis. 2d 682, 288 N.W.2d 862 (1980). Thus, we may, at our discretion, review all aspects of the case. Here, the parties have argued the validity of Federated's rule throughout the proceedings, and they have briefed the issue before this court. Because the validity of the rule ultimately affects whether Federated discriminated against Kessler, we consider it necessary and appropriate to decide this issue.

We review this case by applying the certiorari standard of review. The scope of an appellate court's

review of a certiorari decision is the same as the trial court's. *State ex rel. Harris v. Annuity & Pension Board,* 87 Wis. 2d 646, 651–52, 275 N.W.2d 668 (1979). In certiorari review, the reviewing court is limited to determining: (1) whether the commission kept within its jurisdiction; (2) whether it acted according to law; (3) whether its actions were arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question. *State ex rel. Palleon v. Musolf,* 120 Wis. 2d 545, 356 N.W.2d 487 (1984).

Whether the commission acted according to law requires us to construe the Madison equal opportunities ordinance and apply the ordinance to the facts. The question of whether the facts in a particular case fulfill a particular legal standard is a question of law. *Department of Revenue v. Exxon Corp.,* 90 Wis. 2d 700, 713, 281 N.W.2d 94 (1979); *Hennekens v. River Falls Pol. & Fire Comm.,* 124 Wis. 2d 413, 424, 369 N.W.2d 670 (1985). The court also must determine whether the evidence was such that the commission might reasonably make its determination and whether that determination is supported by substantial evidence in the record. *Stacy v. Ashland County Dept. of Public Welfare,* 39 Wis. 2d 595, 602, 159 N.W.2d 630, 634 (1968); *Palleon,* 120 Wis. 2d at 549.

We begin our analysis by summarily rejecting the analysis of the court of appeals. That court concluded that Federate's rule only operated to punish single persons involved with married persons and that the rule could not be invoked to sanction a married person for being involved with a single person. Under this analy-

sis, the court of appeals concluded that the rule clearly discriminated on the basis of marital status because only single persons were subject to the rule's mandate. The court, however, noted that its conclusion would be different if the rule applied equally to prohibit all persons, regardless of marital status, from being parties to an extramarital affair. In fact, Federated's rule did apply equally to prohibit all persons, whether married or single, from being involved with a married coemployee, and the rule also applied to prohibit all married persons from having such affairs with other coemployees, whether married or single. The commission's finding was that the rule "prohibited employees from associating with married employees of the opposite sex outside of work-related matters." Thus, the rule did not simply prohibit single employees from being a party to an extramarital affair. Because the premise on which the court of appeals relied is false, that court's analysis of the issue in this case also is faulty.

We therefore are confronted with the competing analysis of the circuit court and the commission. The commission concluded without discussion that the rule was facially discriminatory. The circuit court reasoned that the rule was not facially discriminatory because it prohibited all employees, regardless of marital status, from being party to an extramarital affair. The court stated that the prohibition of the rule applied to the *conduct* of being involved in such an affair, rather than to the status of being married or single. Single persons were as much within the prohibition of the rule as married persons. Thus, according to the circuit court, the sanction of the rule did not discriminate on the basis of marital status.

We agree with the analysis of the circuit court. In this case, Federated's rule proscribed certain conduct among employees which all employees were required to honor. The sanction of the rule is not triggered by the offending employee's marital status. The rule does not require the offending person to be married for its application because a person can be a party to an extra-marital association regardless of their own marital status. In this case, for instance, Kessler would have been prohibited from associating with Farin, a married person, whether he had been married, separated, divorced, widowed or single. His marital status was irrelevant to his discharge because Farin was married. Thus, Federated's rule prohibited a course of conduct rather than a status. The rule simply does not condition employment on having a specific marital status.

The commission and Kessler both propose hypothetical situations which allegedly are analogous to this case, and which they argue compel the conclusion of discrimination. We conclude that the proposed analogies are inapposite.

The commission's hearing examiner analogized Federated's rule to one which prohibited white male employees from associating with black employees of the opposite sex. The examiner concluded that such a policy would be discriminatory and an "employee is not obligated to nor can be made to suffer any adverse consequences from the failure to follow a discriminatory policy."

The examiner incorrectly compares the instant case to his hypothetical. In the hypothetical, each person's race is a basis of classification. Specified racial

characteristics, in association with other specified racial characteristics, in association with other specified racial characteristics, inevitably are decisive in applying the rule. Federal courts have recognized that such rules provide affected whites, as well as blacks, standing to raise claims of racial discrimination. For example, this type of claim was permitted in *Whitney v. Greater N.Y. Corp. of Seventh-Day Adv.,* 401 F. Supp. 1363, 1366 (S.D. N.Y. 1975), wherein the court stated:

> "Adventists contends that the complaint is defective because it does not allege that Whitney was discharged because of *her* race but, rather, because of the race of her friend, Samuel Johnson, and that the law is settled that white plaintiffs cannot maintain a Title VII action because of alleged discrimination against a minority group member. It is argued that the plaintiff therefore 'lacks standing' to assert a claim under Title VII and fails to state a claim upon which relief can be granted.
>
> "The argument is unpersuasive. Manifestly, if Whitney was discharged because, as alleged, the defendant disapproved of a social relationship between a white woman and a black man, the plaintiff's race was as much a factor in the decision to fire her as that of her friend. Specifying as she does that she was discharged because she, a white woman, associated with a black, her complaint falls within the statutory language that she was 'discharge[d] . . . because of [her] race.' "

*Also see Holiday v. Belle's Restaurant,* 409 F. Supp. 904 (W.D. Pa. 1976). Here, however, Kessler's marital status was not decisive in order to violate Federated's rule because the rule can be violated by any person, regardless of marital status, who associates with a married coemployee.

Kessler argues that a better example is a work rule that prohibits all employees, whether black or white, from associating with black employees after work. Such a hypothetical rule, however, is distinguishable from Federated's rule and does not have any persuasive quality in this case. The difference in the rules concerns the obvious adverse impact on blacks in the hypothesized case and the lack of a legally recognizable adverse impact on married persons prohibited from having extramarital affairs. Kessler's hypothetical case is distinguishable from this case, therefore, because a discharge based on an employee's refusal to comply with a work rule which discriminates on the basis of race would violate the limited public policy exception to the employment at will doctrine. *See Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 572–74, 335 N.W.2d 834 (1983), holding that an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law.

In order for this case to be analogous to Kessler's hypothesized case, we would have to conclude that Federated's work rule is discriminatory as applied to at least some employees. We have already concluded that the rule is not facially discriminatory because it applies to all employees regardless of marital status. The only other possible basis for concluding that the work rule is discriminatory relies on the disparate impact analysis derived from civil rights adjudication. We invoked this analysis in *Ray-O-Vac v. ILHR Department,* 70 Wis. 2d 919, 930, 236 N.W.2d 209 (1975), to define the test for prohibited employer discrimination. That case involved alleged sex based discrimination and we stated: "Whether arising under the fourteenth amend-

ment or under the statute, however, the threshold question remains the same: is there 'discrimination?' That is, is there disparate treatment for persons similarly circumstanced?" Similarly, in *Wisconsin Telephone Co. v. ILHR Dept.,* 68 Wis. 2d 345, 368, 228 N.W.2d 649 (1975), we stated that the "broad purpose of the Fair Employment Act is to eliminate practices that have a discriminatory impact as well as practices which on their face amount to invidious discrimination." Kessler's hypothesized case has an obvious disparate impact on black employees. In this case, however, we must carefully analyze the effect of Federated's rule in relationship to the purpose of the legislative prohibition against marital status discrimination to determine whether the rule is impermissibly discriminatory.

The circuit court noted that Federated's rule, prohibiting work place romances, has the effect of prohibiting all married employees from having any associations with coemployees. By contrast, unmarried employees can have relationships with other unmarried employees. The rule, therefore, is more restrictive of the conduct of married employees than it is of unmarried employees.

The circuit court concluded that classifications which do not "adversely affect . . . status as an employee" do not violate the Madison equal opportunities ordinance. The court further concluded that prohibiting married employees from having extramarital associations does not adversely affect an employee's status because such a limitation is fully consistent with public policy. The court reasoned that a work rule which compels conformity with fundamental public policy cannot

be considered an "adverse" condition of employment. We agree. We also expand upon the court's reasoning, however, by specifically discussing the meaning of the term "marital status" as used in the Madison equal opportunities ordinance.

Protection against marital status discrimination is a relatively recent innovation in legislative enactments which prohibit various forms of discrimination. Notably, the intended scope of protection of these enactments is not clearly stated. The Madison ordinance at issue in this case simply prohibits employment discrimination on the basis of marital status. Madison General Ordinances 3.23(2)(1) states that the term marital status "shall include being married, separated, divorced, widowed, or single."

The Wisconsin Fair Employment Act similarly prohibits employment discrimination on the basis of marital status and defines that term identical to the Madison ordinance. *See* sec. 111.32(12), Stats. The Fair Employment Act provides somewhat more guidance in defining prohibited practices by recognizing an exception to the general rule. Section 111.345 provides that it is not employment discrimination because of marital status to prohibit an individual from directly supervising or being directly supervised by his or her spouse.

Our analysis leads us to conclude that the ordinance is not intended to protect an employee's right to engage in an extramarital affair. We construe the protection against marital status discrimination to fully encompass the very personal decision of an employee to marry, to remain single, or to divorce. An employer's rule which pressures a person to make a particular choice about marriage intrudes into an area where the Madison ordinance prohibits employer interference.

A person who has voluntarily made a decision to become married, however, can be compelled to honor the commitment of that decision while he remains married. Under such an employment rule, the employee constantly controls his options regarding marriage or divorce. The employee can make whatever choices regarding his marital status that he wishes without compulsion from the employer. He can marry. He can remain single. He can divorce.

■ Discrimination is the label society gives to employer decisions that contravene public policy. We conclude that the public policy of the Madison equal opportunities ordinance forbids intrusion into the decision of an employee to marry, divorce or remain single. It does not violate public policy, however, to limit extramarital affairs among coemployees because married employees are not similarly circumstanced to single employees in respect to the right to associate with other employees while married.

Kessler argues that the rule does not prohibit associations outside of work between single employees and, therefore, the rule allegedly is more restrictive of the conduct of married employees than single employees. Rather than being impermissibly restrictive as to married persons, however, the rule embodies a recognition of accepted public policy as stated in the Wisconsin Statutes and Madison General Ordinances. Kessler, therefore, incorrectly analogizes Federated's rule to a hypothetical rule prohibiting all employees, whether white or black, from associating after work with black employees.

The work rule is consistent with public policy as stated in the Wisconsin Statutes and the Madison General Ordinances. Section 765.001(2), Stats., states:

> " (2) INTENT. It is the intent of chs. 765 to 768 to promote the stability and best interests of marriage and the family. It is the intent of the legislature to recognize the valuable contributions of both spouses during the marriage and at termination of the marriage by dissolution or death. Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the state. The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . . The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned."

Federated's work rule is consistent with the public policy goals set forth in sec. 765.001(2), in that it attempts to prohibit extramarital affairs, which can lead to the impairment or dissolution of existing marital relationships.

We conclude, therefore, that Federated's rule prohibiting any person from associating with a married coemployee does not impermissibly discriminate against the class of married employees. Reliance on the rule by Federated in the termination of Kessler was a permissible action in the employment at will relationship, which did not violate Madison's antidiscrimination ordinance or any "fundamental and well-defined

214

public policy as evidenced by existing law." *Brockmeyer,* 113 Wis. 2d at 573.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I dissent on two grounds. First, the court is acting contrary to its own rules (sec. 809.62(6), Stats. 1983–84) in deciding this case on an issue that was not raised in the petition for review. Second, I disagree with the court's decision that the Federated rule does not violate the Madison ordinance.

I.

Federated's petition sought this court's review on only one issue: "Should the 'in-part' test of *Muskego-Norway* be applied to discharges not involving union activity outlined in MERA or SELRA?" (Petition for Review, p. 5) The majority poses but does not answer this question. Page 192.

Section 809.62(2)(a), Stats. 1983–84, provides that a petition for review "must contain a statement of the issues presented for review." Section 809.62(6), adopted in 1982 (104 Wis. 2d xi, xxi), provides that "if the petition is granted, the petitioner cannot raise or argue issues not set forth in the petition unless ordered otherwise by the supreme court." This court's order granting the petition to review did not permit or require additional issues to be raised. The *Rhone* case, on which the majority relies (at page 205) to decide an issue not set forth in the petition to review, preceded the rule change.

The majority should decide the important legal issue posed in the petition to review, not a different issue.

## II.

If the court is going to determine whether Federated's rule violates the Madison ordinance, the first step is to state what the Federated rule is. Federated's rule was unwritten, and Bockoven described the rule in somewhat different ways as he testified. The determination of what the Federated rule is and what conduct the Federated rule proscribes is, in this case, a question of fact. The Commission's findings of fact state the rule as follows:

> *"Federated 'prohibited employees from associating with married employees of the opposite sex outside of work-related matters.'"*

The rule prohibits a married or single employee from associating with a married employee of the opposite sex outside of work-related matters. The only employees of opposite sexes who may associate with each other outside of work-related matters are single employees.

The rule prohibits any kind of "associating"— including casual social relations and contacts, such as sharing mealtime—because, as Bockoven testified, one-thing-can-lead-to-another. (See Bockoven's testimony quoted three times at pages 197–199, circuit court decision at page 203.) The Federated rule is thus not limited to prohibiting adultery between employees. The

majority opinion blithely equates the terms "associate," "romance," and "extramarital affair."[1]

The majority opinion holds that the Federated rule does not discriminate on the basis of marital status: under the rule married and single employees are treated the same—both are prohibited from associating with a married employee. Thus whether Kessler was married or single is irrelevant, the majority says; he would have been fired regardless of his marital status. According to the majority, he was fired because of his conduct, namely, associating with a married employee of the opposite sex.

It is clear that the Federated rule classifies people into two groups. One group is off-limits; the other is not. Membership in each group is based on marital status. Thus, the Federated rule clearly creates a classification based on marital status. Imposing penalties on those who violate rules based on marital classification is the kind of discrimination that the ordinance prohibits.

The distinction between conduct and status upon which the majority relies is unpersuasive. The error in the majority's reasoning is clear if we restate the Federated rule as a work rule with respect to black and white employees. Suppose, for example, a work rule provides that all employees—black as well as white—are "prohibited from associating with black employees outside of work-related matters." Under this rule, the only employees who could associate outside of work-related activities are white employees. Then suppose that a white employee has three meals with a black em-

---

[1] It reminds me of the cartoon in which a couple meets and has this exchange: "Hello there!" "Enough of this romantic chitchat—take off your clothes!"

217

ployee and the white employee is fired for violating the work rule. Borrowing from the majority opinion in this case, the employer argues that the rule does not discriminate on the basis of race because the fired employee would have been treated the same way whether he was black or white. All employees, white and black, are treated the same—none can associate with a black employee. The rule, argues the employer, does not discriminate on the basis of race; it merely regulates conduct.

While the court here concludes that "the [Federated] rule is not facially discriminatory because it applies to all employees regardless of marital status," the majority finds the same kind of reasoning in the racial example unpersuasive. The majority concedes that the racial work rule is clearly discriminatory on the basis of race. Page 210.

The point is that the Federated rule (like the racial rule) is based on a prohibited classification. Whether the Federated rule is viewed as regulating conduct or status, a rule which classifies people and treats them differently with respect to a proscribed characteristic is not acceptable under the ordinance. The majority's characterizing the Federated rule as regulating conduct, not status, ignores the substance of the rule.

The majority's basic distinction between the racial example posed and the Federated rule is that the racial rule has no legitimate basis and the Federated rule does. In upholding the Federated rule this court's opinion rests heavily on the idea that the rule is valid because it furthers public policy. The majority reasons that the Federated rule is acceptable because it prevents adultery and stabilizes the institution of mar-

riage. (See trial court quoted at pages 201–203; see majority's reasoning at pages 211–215.)

If the Federated rule were limited to prohibiting extramarital sexual relations between employees of the opposite sex then this public policy argument may be made. But the rule prohibits even casual social contacts with married employees of the opposite sex.

I do not believe that prohibiting all single and married employees from associating with married employees of the opposite sex is necessary to protect marital stability. Indeed, such a rule might even discourage employees from getting married. Instead, I think an argument might be made that the Federated rule contravenes public policy by interfering with an employee's legitimate expectation of associating socially with whomever he or she pleases. A rule that seeks to preclude adultery by prohibiting a non-work-related social association with married employees of the opposite sex is too broad and too restrictive to be justified as good public policy which outweighs the discriminatory effect of the rule.

I conclude that the Federated rule violates the Madison ordinance, and I would apply the rule adopted in *Muskego-Norway C.S.J.S.D. No. 9 v. WERB,* 35 Wis. 2d 540, 151 N.W.2d 617 (1967). Accordingly, I would affirm the decision of the court of appeals.

For the reasons set forth, I dissent.