COUNTY OF DANE a municipal corporation, Plaintiff-Appellant,†

v.

Dwight NORMAN and Patricia Norman, Defendants-Respondents-Petitioners.

Supreme Court

*No. 91–0486. Submitted on briefs February 3, 1993.—Decided April 13, 1993.*

(Also reported in 497 N.W.2d 714.)

†Motion for reconsideration denied May 10, 1993.

For the defendants-respondents-petitioners there were briefs by *Michael J. Lawton, David E. Rohrer* and *Lathrop & Clark,* Madison.

For the plaintiff-appellant the cause was submitted on the brief of *Margaret L. O'Donnell,* assistant corporation counsel, with whom on the briefs was *Cal W. Kornstedt,* corporation counsel.

STEINMETZ, J.   The issue in this case is whether Dwight Norman discriminated against potential tenants on the basis of "marital status," contrary to Chapter 31 of the Dane county ordinances, when he refused to rent a three-bedroom duplex to two groups of potential tenants, on separate occasions, on the ground that his policy as a landlord is not to rent to groups of unrelated individuals seeking to live together. One group seeking to rent Norman's property consisted of three single women, and the other group consisted of two single women and one of the women's two children.

We hold that Norman's policy does not violate Chapter 31 of the Dane county ordinances which proscribes discrimination based on "marital status." Norman refused to rent to the prospective tenants in this case because they intended to live together. Living together is "conduct" not "status."

This action was commenced pursuant to a summons and complaint filed on February 26, 1990. The complaint

alleged that Norman violated Dane county's fair housing ordinance by refusing to rent a three-bedroom duplex to (a) three single women and (b) two single women and the two children of one of the women. The complaint alleged that the refusal was impermissibly based on the "marital status" of the prospective tenants.

The Dane county circuit court, Judge Richard J. Callaway, issued a decision and order denying Dane county's motion for summary judgment and granting Norman's cross motion for summary judgment. The court found no violation of Dane county's fair housing ordinance. The court of appeals reversed the circuit court judgment, concluding that Norman's motion for summary judgment dismissing the complaint should have been denied and that Dane county's motion for summary judgment should have been granted. *County of Dane v. Norman,* 168 Wis. 2d 675, 484 N.W.2d 367 (Ct. App. 1992).

The standard of review for summary judgment motions is set forth in *Bell v. County of Milwaukee,* 134 Wis. 2d 25, 30, 396 N.W.2d 328 (1986):

> Upon review of a summary judgment decision, this court must apply the standards set forth in 802.08(2), Stats. . . . in the same manner as the trial court. *Kremers-Urban Co. v. American Employers Ins.,* 119 Wis. 2d 722, 733, 351 N.W.2d 156 (1984). Since there is no disagreement as to issues of fact, this court must determine whether the . . . moving parties were entitled to judgment as a matter of law. Section 802.08(2), Stats. This court decides questions of law independently, without deference to the decision of the trial court and the court of appeals. *Ball v. District No. 4 Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984). (Footnote omitted.)

In May, 1989, Joyce Anderton contacted Dwight Norman and asked if he had any three-bedroom duplexes available. He said some would be available in July and asked how large Anderton's family was. She said she was not married and would be living with two single women. Norman replied that he would rent to her individually but not to groups of unrelated individuals. He rejected an offer that one of the three be solely responsible for the rent.

In August, 1989, Norman showed one of his apartments to Deb Dana and her two children. Dana told Norman that she and the children would be living with another woman. He refused to rent to Dana on that basis.

It is undisputed that under Norman's policy individuals who are married, divorced, widowed, separated, or single are eligible to rent from him. Norman's policy is not to rent to groups of unrelated individuals. Neither Anderton nor Dana inquired about renting as single persons.

Chapter 31 of the Dane county ordinances, entitled "Fair Housing" prohibits "unlawful discrimination in housing" based on "marital status." Section 31.02, Dane county ordinances. More specifically, Chapter 31 provides as follows:

> **Section 31.02   INTENT.** It is the intent of this chapter to render unlawful discrimination in housing. It is the declared policy of the County of Dane that all persons shall have an equal opportunity for housing regardless of . . . [the] marital status of the person maintaining a household . . ..
>
> **Section 31.03   DEFINITIONS.** The following words and phrases have the meanings indicated unless the context requires otherwise:
>
> . . .

(2) **Discriminate and Discrimination** mean to segregate, separate, exclude or treat any person or class of persons unequally because of . . . [the] marital status of the person maintaining the household . . ..

. . .

(5) **Marital status** means being married, divorced, widowed, separated, single or a cohabitant.

**Section 31.10 DISCRIMINATION PROHIBITED.** It shall be unlawful for any person to discriminate:

(1) By refusing to sell, lease, finance or contract to construct housing or by refusing to discuss the terms thereof . . ..

As stated above, "marital status" under Dane county ordinance sec. 31.03(5) is defined as "being married, divorced, widowed, separated, single or a cohabitant." The term "status," is not specifically defined in Chapter 31 but means in its common and approved usage "state or condition." Black's Law Dictionary (6th ed. 1990). Thus, the Dane county ordinance prohibits discrimination based on the state or condition of being married, the state or condition of being single, and the like.

Dane county argues that the inclusion of the term "cohabitant"[1] in the definition of "marital status" indicates that the term "marital status" was intended to cover groups of unrelated individuals seeking to live together. As a result, Norman's rental policy violates Chapter 31. We reject this argument. Chapter 31 is invalid to the extent that it seeks to protect "cohabitants."

---

[1] Chapter 31 does not specifically define "cohabitant." Webster's Dictionary defines the term as follows: "to live together as husband and wife . . . without a legal marriage having been performed." Webster's Third New International Dictionary (1966).

Because Dane county's argument turns on an invalid provision, it is unpersuasive.

Sections 31.02, 31.03 and 31.10, Dane county ordinances, were passed pursuant to the enabling authority contained in sec. 66.432(2), Stats. The authority granted to municipalities through enabling legislation like sec. 66.432 is not unlimited. "[A] municipality may not pass ordinances 'which infringe the spirit of a state law or are repugnant to the general policy of the state.' " *Anchor Savings & Loan Ass'n v. Madison EOC,* 120 Wis. 2d 391, 397, 355 N.W.2d 234 (1984) (quoting *Fox v. Racine,* 225 Wis. 542, 545, 275 N.W. 513 (1937)); *see also* 5 Eugene McQuillin, *The Law of Municipal Corporations* sec. 15.21 (3rd ed. 1989). McQuillin elaborates on this rule as follows:

> The rule requires at least substantial conformity, and under it an ordinance cannot prohibit what the public policy permits, or permit that which public policy forbids. Nor, under a general grant of power, can a municipal corporation adopt ordinances which infringe the spirit, or are repugnant to the policy, of the state as declared in its legislation. It follows that if the state has expressed through legislation a public policy with reference to a subject, a municipality cannot ordain an effect contrary to or in qualification of the public policy so established, unless there is a specific, positive, lawful grant of power by the state to the municipality to so ordain.

5 McQuillin, *supra,* sec. 15.21.

Chapter 31's requirement that landlords make available their rental units to "cohabitants" is inconsistent with the public policy of this state which seeks to promote the stability of marriage and family. As a result, it is outside the enabling authority of sec. 66.432(2), Stats., and invalid.

689

Chapters 765–768, Stats., clearly set forth Wisconsin's policy of encouraging and protecting marriage. The preamble of intent to those sections states as follows:

**(2)** INTENT. It is the intent of chs. 765 to 768 to promote the stability and best interests of marriage and the family. It is the intent of the legislature to recognize the valuable contributions of both spouses during the marriage and at termination of the marriage by dissolution or death. Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the state. The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. The seriousness of marriage makes adequate premarital counseling and education for family living highly desirable and courses thereon are urged upon all persons contemplating marriage. The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned. Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife, who owe to each other mutual responsibility and support. Each spouse has an equal obligation in accordance with his or her ability to contribute money or services or both which are necessary for the adequate support and maintenance of his or her minor children and of the other spouse. No spouse may be presumed primarily liable for support expenses under this subsection.

**(3)** CONSTRUCTION. Chapters 765 to 768 shall be liberally construed to effect the objectives of sub. (2).

Section 765.001(2), (3), Stats.; *see also Phillips v. Wisconsin Personnel Commission,* 167 Wis. 2d 205, 220, 482

690

N.W.2d 121 (Ct. App. 1992) (the court of appeals noted that unmarried cohabitants do not receive the same statutory protections, *i.e.,* a mutual duty of general support, as do spouses); *Federated Elec. v. Kessler,* 131 Wis. 2d 189, 214, 388 N.W.2d 553 (1986) (recognizing that an employer's prohibition against extramarital affairs among its employees conforms with the policy set forth in sec. 765.001(2)).

Norman's motivation for denying rental to the individuals in this case was triggered by their "conduct," not their "marital status." As explained above, "marital status" refers to the state or condition of being married, the state or condition of being single, and the like. "Conduct," on the other hand, is defined by Black's Law Dictionary (6th ed. 1990) to mean "[p]ersonal behavior; deportment; mode of action; [and] any positive or negative act." It is undisputed that Norman would have rented to any of the prospective tenants, regardless of their individual "marital status," if they had not intended to live together. Their living together is "conduct," not "status."

This court's conclusion that Norman's policy turns on "conduct" rather than "marital status" is consistent with Wisconsin decisions distinguishing between "status" and "conduct" in the context of employment discrimination.[2] In *Kessler,* 131 Wis. 2d at 214, we held

[2] Our conclusion is also consistent with the Wisconsin Department of Industry, Labor and Human Relations—Equal Rights Division's ("ERD") interpretation of the Wisconsin Fair Housing Law, sec. 101.22, Stats. The language in the state statute parallels the language in the Dane county ordinances at issue here. The ERD has consistently concluded that the state prohibition against marital status discrimination in housing does not protect groups of unrelated individuals seeking to live together. *Rudolph v. Davis,* ERD case No. 8450035 (June 10, 1984); *Spen-*

that a workplace rule which prohibited employees from associating with married employees of the opposite sex outside of work-related matters did not constitute marital status discrimination in violation of a Madison employment discrimination ordinance. We reasoned, in part, that the rule was aimed at "conduct" rather than "marital status." The rule applied to both married and single employees. The triggering event was associating with a married coemployee. *Id.* at 207–09.

In *City of Onalaska v. LIRC,* 120 Wis. 2d 363, 367, 354 N.W.2d 223 (Ct. App. 1984) the court upheld the discharge of a police officer trainee on the ground that the employer relied on the underlying conduct of the employee, racing on a public highway, rather than merely his status as a person with a record of arrest, which resulted from that conduct.

In *Squires v. Labor & Industry Review Commission,* 97 Wis. 2d 648, 652–53, 294 N.W.2d 48 (Ct. App. 1980) the court upheld the discharge of an alcoholic employee based not on his status as an alcoholic, but on his conduct in being unable to perform his duties.

Other courts have distinguished between status and conduct in housing discrimination cases. *See McFadden v. Elma Country Club,* 26 Wash. App. 195, 613 P.2d 146 (1980); *Hudson View Properties v. Weiss,* 450 N.E.2d 234 (1983).

---

*cer v. Norman Construction Co.,* ERD case No. 8400026 (April 11, 1986); *Anderton v. Norman,* ERD case No. 8912680 (May 31, 1991); *Critchley v. Norman Construction Co.,* ERD case No. 9001953 (September 7, 1990); *Dennis v. Norman Construction Co.,* ERD case No. 9001954 (September 7, 1990).

Section 101.22, Stats., does not expressly protect "cohabitants." Whether to add the word "cohabitant" to the statute is a decision for the legislature.

We hold that Norman's policy does not violate Chapter 31 of the Dane county ordinances. Chapter 31 proscribes discrimination based on the state or condition of being married, the state or condition of being single, and the like. Norman refused to rent to the prospective tenants in this case because they intended to live together. Living together is "conduct" not "status".

*By the Court.*—The decision of the court of appeals is reversed.

HEFFERNAN, CHIEF JUSTICE *(dissenting)*. In upholding Dwight and Patricia Norman's right to refuse to lease apartments to groups of unrelated persons, today's holding defies legal examination and legislative resolve alike. I thus reject the majority's reasoning and instead conclude that the Normans' actions are in violation of Chapter 31 of Dane county's fair housing ordinance which specifically forbids landlords to discriminate against persons on the basis of "marital status." Accordingly, I dissent from the majority's opinion.

The majority begins its assault on Chapter 31 by holding that insofar as the Dane county ordinance permits cohabitation among unrelated persons it violates existing public policy and therefore exceeds the scope of municipal powers authorized in sec. 66.432, Stats. Specifically, the majority maintains that chapters 765–768, Stats., which set forth this state's policy in respect to the promotion of marriage and family, render this portion of the county ordinance invalid. In so holding, the majority misconstrues the scope of municipal authority in the state of Wisconsin and mistakes legislative support for marriage for advocacy of marriage as the only acceptable relationship between Wisconsin citizens.

In 1965, the state legislature enacted Wisconsin's first fair housing statute, now numbered sec. 101.22. Although initially concerned with race discrimination, the statute gradually has expanded to guarantee equal access to housing for all persons regardless of "sex, race, color, sexual orientation, disability, religion, national origin, marital status, family status, lawful source of income, age or ancestry . . .." Wis. Stats., sec. 101.22(1). Subsequent to enacting the state statute, the legislature passed sec. 66.432, Stats, authorizing municipalities to enact analogous local ordinances prohibiting housing discrimination among suspect classes.[1] In the statement of intent to sec. 66.432 the legislature spelled out its vision for future such statutes:

---

[1] Although the majority hinges today's holding on Dane county's statutory authority to enact housing laws pursuant to sec. 66.432, it overlooks the fact that the county might just as easily have exercised its home-rule authority in enacting chapter 31. As stated in an opinion of the attorney general dated October 3, 1966:

> Cities and villages have power, pursuant to sec. 62.11(5) and 61.34(1) to legislate for the government and good order of the city or village and for the health, safety and welfare of the public. Under 60.18(3) towns may make orders or bylaws for the management of the town conducive to peace, welfare and good order. . . .

The opinion concludes that even prior to the passage of 101.60 [now numbered 101.22] municipalities possessed "ample power to pass local regulations to prevent and remove all discrimination in housing." Op. Att'y Gen. 231–32 (1966).

By noting the problem of ensuring equal access to housing to be a matter of both statewide and local concern, the state legislature has provided municipalities two options under which to enact local housing ordinances. I conclude that Dane county could as easily have acted pursuant to either statutory or home-rule authority.

> [t]he right of all persons to have equal opportunities for housing . . . is a matter both of statewide concern under s. 101.22 and also of local interest under this section and s. 66.433. The enactment of s. 101.22 by the legislature shall not preempt the subject matter of equal opportunities in housing from consideration by *political subdivisions, and shall not exempt political subdivisions from their duty, nor deprive them of their right, to enact ordinances which prohibit discrimination in any type of housing solely on the basis of an individual being a member of a protected class.* (Emphasis added.)

Wis. Stats., sec. 66.432(1). As the quoted portion indicates, the legislature not only anticipated but in fact urged localities to enact laws such as the one at issue today.[2]

In keeping with the legislature's evident concern over the scope of the problem confronting local municipalities, section 66.432(2) granted municipalities wide latitude in enacting these local ordinances: they could either adopt a model similar to sec. 101.22, or draft an ordinance "even more inclusive in its terms . . .."

Dane county's fair housing ordinance closely mirrors its progenitor, sec. 101.22(1), Stats. Exercising the right under sec. 66.432 to make its local ordinance "even more inclusive in its terms," however, the county opted to broaden the definition of "marital status" contained in sec. 101.22 to include "cohabitation." Contrary to the majority's holding, I conclude that this addition to the

---

[2] In construing the nearly identical language of sec. 101.60, Stats., the precursor to sec. 101.22, the Attorney General noted that not only is the statute without specific language limiting the power of cities and villages to enact similar ordinances but in fact, "specific language [shows] a legislative intent that municipalities are to use their delegated powers to complement state law." Op. Att'y Gen. 232 (1966).

classification "marital status" was within the scope of authority granted the county under section 66.432, Stats.[3]

Section 66.432(1) indicates a manifest legislative intent to grant the communities broad authority in enacting ordinances to combat housing discrimination. I am particularly persuaded of this by the all-encompassing scope of the categories included in the statement: "sex, race, color, physical condition, disability . . . sexual orientation, . . . religion, national origin, marital status, family status . . . lawful source of income, age or ancestry . . .." This exhaustive list of protected classifications illustrates that the legislature understood that magnitude of the situation confronting the local municipalities. Accordingly, in keeping with the scope of the enabling statute, the legislature must have intended municipalities to have plenary authority to enact ordinances covering as many forms of housing discrimination as municipalities considered appropriate.

It is also clear that the legislature realized that it could not foresee the specific kinds of discrimination endemic to regions of the state. Therefore, sec. 66.432

---

[3] In construing the phrase "even more inclusive" for purposes of the instant dispute, this court is guided by well-established rules of statutory construction. The court must give meaning to all the words and clauses of the statute in order to minimize the risk of statutory surplusage. *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981). Moreover, this court must construe sec. 66.432 liberally so as to give fullest effect to the legislative purpose in enacting the statute. *State ex rel. Mueller v. School District Board,* 208 Wis. 257, 260, 242 N.W. 574 (1932). This is particularly true with civil rights statutes which are remedial in nature and thus should be liberally construed to give fullest effect to the constitutional mandates prohibiting discrimination. 74 Op. Att'y Gen. 234, 237 (1985) (*citing* 14 C.J.S. Supp. Civil Rights § 10 (1985)).

expressly authorizes local municipalities to tailor the listed classifications to meet their specific needs. This interpretation of the statute is confirmed by an advisory opinion to the Milwaukee County Board dated December 17, 1985, in which the Attorney General held that sec. 66.433, Stats., which authorized "community relations-social development commissions," provided a "clear legislative expression of intent that communities may have differing problems which should be addressed at the local level." The opinion went on to conclude that sec. 66.432(2) should be construed to afford communities wide discretion to determine the best manner to address particularly local problems involving fair housing. 74 Op. Att'y Gen. 234 (1985).

In the case of Dane county, there are obvious reasons, of which we appropriately take judicial notice, for the local fair housing ordinance to contain a provision prohibiting discrimination against groups of unrelated persons. Dane county hosts both the state government and the state's largest university campus. Both of these institutions tend to attract large numbers of young, single individuals—people for whom rent-sharing is often the only means of obtaining affordable housing. One can imagine the ensuing chaos if property owners on the Madison isthmus decided to rent only to single individuals or related cohabitants; thousands of residents thus displaced would be unable to find adequate, affordable housing in Madison.

Regardless of the meritorious necessity for adding "cohabitation" to the list of suspect classifications protected from housing discrimination, the majority maintains that by doing so Dane county has enacted an ordinance in violation of the Wisconsin Family Code.[4]

─────────

[4] Interestingly, the abolishment of criminal sanctions for cohabitation in 1983 lead this court to conclude that the state is

697

Implicit in the reasoning of the majority is the assumption that "cohabitants" include only unrelated persons residing together in a sexual relationship.[5] Unfortunately, this premise is based entirely on a partial definition of "cohabitation." Had the majority considered more complete definitions it might have arrived at a conclusion more in keeping with contemporary mores. For example Webster's New Collegiate Dictionary (1980) defines the verb "cohabit" as: "**1:** to live together as husband and wife **2 a:** to live together or in company . . . **b:** to exist together . . .." Similarly, Webster's New World Dictionary of the American Language (1972) defines the noun "cohabitant" as "a person living together with another or others." It is this broad definition of "cohabitation" that is implicated in the Normans' rental policy which affects all groups of unrelated persons who reside together, not only those who "cohabitate" as husband and wife. The Normans' prospective tenants included a single mother of two seeking to share an apartment with a second woman, and three single women. Absent any evidence that these individuals were in involved in anything other than a cost-sharing relationship, I can not conceive how allowing these individuals to live together co-operatively would in any

---

no longer interested in regulating the private sexual activities of consenting adults. See Wis. Stats., sec. 944.01 (1991–92). See also *Watts v. Watts,* 137 Wis. 2d 506, 405 N.W.2d 305 (1987) (recognizing common law property and contract action between unmarried cohabitants).

[5] I refuse to believe that the majority means to imply with its holding that a group of students cohabitating in a house on the Madison campus poses a threat to the welfare of the Wisconsin family. Therefore, I must assume that the majority is concerned only with those persons who cohabitate as husband and wife.

way affect the health and well-being of Wisconsin families and marriages.[6]

More egregious even than their self-serving definition of cohabitation, is the majority's misinterpretation of the Wisconsin Family Code, chapters 765–768 of the Wisconsin statutes, which "seeks to promote the stability of marriage and family." (Majority Op. at 689). The majority cites *Phillips v. Wisconsin Personnel Commission* and *Federated Elec. v. Kessler* in support of its proposition that having unrelated individuals live together undermines the health and welfare of Wisconsin families. Neither case is applicable to the instant dispute. *Phillips* deals with support obligations affecting the financial security of a spouse and children and thus are linked directly to the health and well-being of a family. *Kessler* is similarly inapposite in that it deals with a work-place regulation prohibiting extramarital affairs among its employees which also is linked directly to maintaining the stability of existing marriages.

While these problems referred to in *Phillips* and *Kessler* are matters of great social concern, they are not the subject of the dispute now before this court. Furthermore, the cases give no indication that in enacting the Family Code the legislature was advocating marriage as a

---

[6] The question of homosexual partnerships raises an even more complex question than the one before the court today. Sections 101.22, 66.432 and chapter 31 all preclude discrimination in housing on the basis of sexual orientation. Nevertheless, the holding of today's majority suggests that landlords may refuse renting to homosexual partners on the basis of their being unrelated individuals living together. I withhold judgment at this time as to whether such a policy would violate the ordinance's "sexual orientation" clause. That question is not before us although the majority appears to invoke that possibility in support of its erroneous conclusion in respect to entirely different facts.

way of life as the majority would have us believe. Section 765.001(2) merely defines the state's role in setting guidelines to help stabilize marriages. As the statute clearly recognizes, "[t]he impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned." The legislature was concerned with marriage *stability*, not marriage *creation*, when it enacted Wisconsin's Family Code.

Past decisions of this court are consistent with this interpretation of the Family Code. In *Watts,* for example, this court rejected the defendant's argument that the Family Code precluded the court from recognizing a cause of action in property or contract between cohabitants. The defendant, relying on *Hewitt v. Hewitt,* 394 N.E.2d 1204 (1979), argued that permitting such causes of action would encourage cohabitation and thereby undermine the legislative goal of promoting marriage and family. The *Watts* court wisely declined to follow this line of reasoning and instead concluded that "the *Hewitt* court made an unsupportable inferential leap when it found that cohabitation agreements run contrary to statutory policy and that the Hewitt court's approach is patently inconsistent with the principle that public policy limits are to be narrowly and exactly applied." *Watts,* 137 Wis. 2d at 522–23. While recognizing the role of the Family Code in promoting the institution of marriage and family, this court nevertheless concluded that the Code's existence should not "restrict a court's resolution of property or contract disputes between unmarried cohabitants." *Id.* at 523–24. So too, I see no reason for the Code's existence to restrict Dane county's authority to follow the legislature's lead in eliminating as many forms of housing discrimination as may be of issue in the county.

700

Having summarily rejected the inclusion of the term "cohabitation" in the county's ordinance, the majority characterizes the Normans' rental policy as a refusal to rent to groups of unrelated persons seeking to live together. In as much as the Normans would have rented to any one of the prospective tenants individually, the majority concludes that the rental policy was based on "conduct" and not "marital status" and therefore falls completely outside the scope of the Dane county ordinance. In support of their holding, the majority relies on various decisions of the Wisconsin court of appeals involving LIRC and decisions from foreign jurisdictions. I am unpersuaded by the majority's arguments and find its reasoning unfounded.

The majority begins its analysis by asserting that people are deemed "cohabitants" because they live together, which is a question of "conduct," not "status." In so reasoning, however, the majority is oblivious to the fact that such an analysis subjects only those "cohabitants" who are single to policies such as the Normans'. For unlike singles, married persons who "live together" are not affected by the rental policy. Given that no difference exists between the conduct of living together of the two groups the discriminatory impact can be attributed only to the parties' "marital status."

The discriminatory effect of the Normans' rental policy is similar to that recently struck down by this court in *Braatz v. Labor and Industry Review Commission,* 174 Wis. 2d 286, 496 N.W.2d 597 (1993). In *Braatz,* we reasoned that a school district's insurance plan impermissibly discriminated on the basis of "marital status," not conduct, because only married employees with duplicate [insurance] coverage were forced to choose between the school district's policy or their spouse's policy. As with the prospective tenants in the

701

instant dispute, the school district's policy was based on the employees' marital status because it treated married employees and single employees differently even though the employees were similarly situated in respect to their employment with the school district.

The majority cites *Kessler* in support of their proposition that the Normans' policy regulated "conduct," not "status." As stated *supra*, however, I conclude that *Kessler* is inapposite to the instant dispute and am unpersuaded by the reasoning of the majority. In *Kessler,* the employment policy prohibiting employees from associating with married employees of the opposite sex outside of work-related activities was upheld because it applied to married and single employees alike. As the today's majority notes, it was the act of associating with married employees that triggered the rule's application, not the employees' marital status. To the contrary, here married and single persons are treated differently solely on the basis of marital status: married persons may live together and unmarried persons may not. Whereas the *Kessler* policy affected the employees only insofar as they related to third parties, the Normans' policy discriminates between the tenants themselves.

I am equally unpersuaded by the other cases relied upon in the majority opinion. In *City of Onalaska v. LIRC,* 120 Wis. 2d 363, 354 N.W.2d 223 (Ct. App. 1984), for example, the court never even addressed the conduct/status distinction as the majority here contends. Rather, the court disregarded LIRC's finding of fact surrounding the police officer's alleged arrest because the agency provided no guidance as to how it had applied the arrest statute. The court construed the "arrest record" statute without deference to LIRC's interpretation so as to include only discharges that are based on information

received from questioning by a law enforcement or military authority. *Id.* at 366–67.

*Squires v. LIRC,* 97 Wis. 2d 648, 294 N.W.2d 48 (Ct. App. 1980), on the other hand, did address the conduct/status distinction but only insofar as the court determined that the employee filing the action had failed to satisfy his burden of proving that "but for his handicap" the University would not have fired him. To the contrary, the instant case does not allege a mixed motive in the application of the policy to the prospective tenants; the Normans were willing to rent to the tenants individually. Accordingly, the discriminatory action at issue in the instant case was based solely on the tenant's marital status as individuals.

Finally, I am unpersuaded by the majority's reliance on previous DILHR-Equal Rights Division interpretations of 101.22 to buttress its decision. Pursuant to sec. 66.432, Stats., Dane county expressly chose to enact an ordinance offering much broader protection than that contained in sec. 101.22. The decision to broaden the scope of "marital status" indicates that the Dane county ordinance was intended to protect interests beyond those outlined in sec. 101.22(1); the ordinance's application should therefore not be limited to that given the parallel state statute. Further, the majority declines to note that LIRC's decisions are in fact split on the question of whether sec. 101.22's "marital status" clause extends protection to unrelated persons living together. For example, contrary to the DILHR interpretations, the circuit court for Waukesha county held in *Sandra Bentrup v. Apple Valley Development Corporation,* that following the enactment of sec. 111.32(42) prohibiting discrimination on the basis of sexual orientation:

[i]t would strain logic to hold that singles who do not profess their sexual preference may be denied a rental unit. It would also be inconsistent for the legislature to expand the prohibited basis of discrimination to include sexual orientation if the legislature did not believe that it had earlier protected single men and women.

*Sandra Bentrup,* Waukesha Co. Cir. Ct., June 10, 1985.[7] Moreover, at least two of the decisions relied upon by the majority were decided on the basis of anti-fornication statutes in effect. *See, e.g., McFadden v. Elma Country Club,* 613 P.2d 146 (1980); *Rudolph v. Davis,* ERD case No. 8450035 (June 10, 1984). I do not disagree that it would contravene the formerly existing anti-fornication statutes to protect unmarried persons who wished to cohabitate as husband and wife. Since 1983, however, Wisconsin law no longer criminalizes fornication between consenting, unmarried adults.

For the foregoing reasons, I conclude that today's holding misconstrues existing law and, without legislative sanction, unwisely engages in *ultra vires* moralizing from the bench. Dane county's ordinance protecting "cohabitants" from housing discrimination is fully consistent with the state legislature's anti-discrimination laws. Accordingly, the Normans' policy of refusing to rent apartments to groups of unrelated individuals violates the county's completely appropriate and legislatively authorized ordinance. I would affirm the decision of the court of appeals.

I am authorized to state Justices ABRAHAMSON and BABLITCH join in this dissent.

---

[7] *See supra,* notes 4 and 6.