STATE of Wisconsin EX REL. Theodore S. PALLEON,
Charles Lescrenier, Ronald C. Shikora and Irvin
T. Aaron, Independence Lodge No. 80, Free & Ac-
cepted Masons and Excelsior Masonic Temple As-
sociation, Petitioners-Respondents-Petitioners,

v.

Mark E. MUSOLF, Wisconsin Department of Revenue,
Charles Dossett, a/k/a Charles Dossette, Edward
H. Snyder, Wisconsin Tax Appeals Commission and
Wisconsin Department of Revenue, Appellants.

Supreme Court

*No. 82–1487. Argued October 1, 1984.—
Decided October 30, 1984.*

(Also reported in 356 N.W.2d 487.)

For the petitioners the cause was argued by *William H. Wilker*, assistant attorney general, with whom on the briefs was *Bronson C. La Follette* attorney general.

For the appellants there was a brief by *Stewart G. Honeck* and *Honeck, Mantyh & Arndt*, Milwaukee, and oral argument by *Stewart G. Honeck*.

STEINMETZ, J. The issue in the case is whether there is substantial evidence in the record to support the finding made by the Wisconsin Department of Revenue (Department) that the Independence Lodge No. 80, Free and Accepted Masons (Lodge) discriminates in its membership on the basis of race.

The Department found the Lodge did racially discriminate. This decision was reversed by the circuit court for Dane county, the Honorable Richard W. Bardwell. On appeal the court of appeals reversed the circuit court and affirmed the Department.[1]

On February 8, 1977, Charles Dossett wrote Dennis Conta, then secretary of the department of revenue, informing him of the rejection of his application into the Masons. Dossett stated he believed he was discriminated

---

[1] *State ex rel. Palleon v. Musolf*, 117 Wis. 2d 469, 345 N.W.2d 73 (Ct. App. 1984).

against because of his race and the secretary was to consider "this letter a formal complaint." Dossett requested the Department investigate his complaint and "take appropriate action in regard to the tax exempt status of this Lodge."

On June 7, 1977, Conta "In the Matter of Income Tax and Property Tax Status of Independence Lodge No. 80, et al." ordered the Lodge to pay income and real estate taxes. That order was preceded by a four-month investigation and hearing chaired by Conta into alleged racial discrimination by the Lodge against Dossett. The Department based its authority to order the Lodge to pay taxes on the case of *Pitts v. Department of Revenue for State of Wisconsin,* 333 F. Supp. 662 (E.D. Wis. 1971) which provided in pertinent part:

"JUDGMENT AND DECREE
"IT IS HEREBY ADJUDGED AND DECREED:
"1. That insofar as Secs. 70.11(4) and 71.01(3)(a) Wis. Stats. afford tax exemptions to organizations which discriminate in their membership on the basis of race, said Sections are declared violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
"2. That the defendants and each of them and their successors are hereby enjoined from granting tax exemptions under secs. 70.11(4) and 71.01(3)(a) Wis. Stats. to organizations which discriminate in their membership on the basis of race."

On July 1, 1977, the Masons petitioned the circuit court of Dane county for review of the department of revenue's order. The Lodge prayed the circuit court remand the case to the Department with directions to dismiss the "complaint" upon which the proceeding was predicated and restore the exemptions from income and real estate taxes. The state moved to dismiss the circuit court proceeding on the grounds the court lacked subject matter jurisdiction. The court denied the state's motion

to dismiss and took judicial notice of the fact the Masons had filed a concurrent petition for review before the Tax Appeals Commission. The court stated the Tax Appeals Commission had jurisdiction over all questions of law and fact arising under the tax laws of the state, but lost that jurisdiction by order of sec. 73.01(4)(a), Stats., effective July 1, 1977.[2] The circuit court noted it had no jurisdiction under ch. 227 as sec. 227.15 specifically exempts the decision of the department of revenue from review. Judicial review is conferred by ch. 227 after the Tax Appeals Commission reviews the department of revenue decision. However, here the Department's decision was outside the Tax Appeals Commission's jurisdiction under command of sec. 73.01(4)(a). The circuit court allowed the Masons to amend the "Petition for Review" into a "Petition for Writ of Certiorari" consequently empowering the court to act.

The case was before the court of appeals on an appeal from a certiorari review. It is before us also on cer-

[2] Sec. 73.01(4)(a), Stats. 1977 provides:

"73.01 Tax appeals commission. . . .

"(4) POWERS AND DUTIES DEFINED. (a) Subject to the provisions for judicial review contained in s. 73.015, the commission shall be the final authority for the hearing and determination of all questions of law and fact arising under sub. (5) and ss. 70.64, 70.88(3), 70.94(3), 70.995(8), 71.12, 72.86(4), 76.38(12)(a), 76.39(4)(c), 76.48(6) and 77.59(6)(b). Whenever with respect to a pending appeal there is filed with the commission a stipulation signed by the department of revenue and the adverse party, under s. 73.03(25), agreeing to an affirmance, modification or reversal of the department's position with respect to some or all of the issues raised in the appeal, the commission shall enter an order affirming or modifying in whole or in part, or canceling the assessment appealed from, or allowing in whole or in part or denying the petitioner's refund claim, as the case may be, pursuant to and in accordance with the stipulation filed. No responsibility shall devolve upon the commission, respecting the signing of an order of dismissal as to any pending appeal settled by the department without the approval of the commission."

tiorari review with no objection raised by the parties to the procedural posture of the case.

The test on certiorari review is the substantial evidence test. *Stacy v. Ashland County Dept. of Public Welfare,* 39 Wis. 2d 595, 602, 159 N.W.2d 630, 634 (1968). The test is whether reasonable minds could arrive at the same conclusion reached by the Department. *Id.* at 603. Also in *Stacy* we stated:

"It is academic whether we consider this review as governed by ch. 227, Stats., or by certiorari. The test on certiorari for sufficiency of the evidence is the substantial evidence test, which has been the subject of many decisions. We see no difference between stating this test in the affirmative and stating it in the negative as is done in sec. 227.20(1)(d), 'unsupported by substantial evidence in view of the entire record as submitted.'" *Id.* at 602.

Moreover,

"Substantial evidence does not mean a preponderance of the evidence. Rather, the test is whether, taking into account all the evidence in the record, 'reasonable minds could arrive at the same conclusion as the agency.' *Sanitary Transfer & Landfill, Inc. v. DNR,* 85 Wis. 2d 1, 15, 270 N.W.2d 144 (1978)." *Madison Gas & Elec. Co. v. Public Serv. Comm.,* 109 Wis. 2d 127, 133, 325 N.W.2d 339 (1982).

In *State v. Goulette,* 65 Wis. 2d 207, 215, 222 N.W.2d 622 (1974), we stated:

" 'The well-settled rule in Wisconsin is that on review by certiorari the reviewing court is limited to determining: (1) Whether the board kept within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question.'

"*See also: State ex rel. Ball v. McPhee,* 6 Wis. 2d 190, 199, 94 N.W.2d 711 (1959) ; *Stacy v. Ashland County Dept. of Public Welfare,* 39 Wis. 2d 595, 600, 159 N.W.2d 630 (1968) ; *State ex rel. Johnson v. Cady,* 50 Wis. 2d 540, 550, 185 N.W.2d 306 (1971) ; *Reidinger v. Optometry Examining Board,* 81 Wis. 2d 292, 260 N.W.2d 270 (1977)." *State ex rel. Staples v. DHSS,* 115 Wis. 2d 363, 370, 240 N.W.2d 194 (1983).

The tax exemptions of the Lodge were granted by the legislature in sec. 71.01(3)(a), Stats.,[3] for income and

---

[3] Sec. 71.01(3)(a), Stats., provides:

"(3) EXEMPT INCOME. There shall be exempt from taxation under this chapter income as follows, to wit:

"(a) Income of mutual insurers exempt from federal income taxation pursuant to section 501(c)(15) of the internal revenue code, town mutuals organized under or subject to ch. 612, foreign insurers, and domestic insurers engaged exclusively in life insurance business, domestic insurers insuring against financial loss by reason of nonpayment of principal, interest and other sums agreed to be paid under the terms of any note or bond or other evidence of indebtedness secured by a mortgage, deed of trust or other instrument constituting a lien or charge on real estate, railroad corporations and sleeping car companies, of car line companies from operation of car line equipment as defined in s. 76.39, and corporations organized under ch. 185 or operating under subch. I of ch. 616 which are bona fide cooperatives operated without pecuniary profit to any shareholder or member, or operated on a cooperative plan pursuant to which they determine and distribute their proceeds in substantial compliance with s. 185.45, and of all religious, scientific, educational, benevolent or other corporations or associations of individuals not organized or conducted for pecuniary profit. This paragraph does not apply to the income of mutual savings banks, mutual loan corporations, savings and loan associations or credit unions except credit unions the membership of which is limited to groups having a common bond of occupation, or association, or to groups within a well-defined neighborhood, community or rural district. Beginning with calendar year 1972 and thereafter, this paragraph does not apply to the income of insurers under ch. 613 operating by virtue of s. 148.03, 447.13, 449.15, 450.13 or 613.80. Tax on the income

sec. 70.11(4),[4] for property. Since the legislature granted the tax exemptions to the Lodge as a fraternal organization, the burden of showing that the exemption was unconstitutionally granted for this Lodge as a result of discrimination practices was on the Department. The Department claims its counsel assumed the burden of proof. In its brief, the Department states, that for the purposes of argument only, if the burden of proof was placed on the Lodge, it was not improper and cited as authority *Comet Co. v. Department of Taxation,* 243 Wis. 117, 123, 9 N.W.2d 620 (1943). *Comet Co.* and *Sisters of St. Mary v. City of Madison,* 89 Wis. 2d 372,

---

of such insurers shall first be payable on or before March 15, 1973, and thereafter under s. 71.10(1)."

[4] Sec. 70.11(4), Stats., provides:

"(4) EDUCATIONAL, RELIGIOUS AND BENEVOLENT INSTITUTIONS; WOMEN'S CLUBS; HISTORICAL SOCIETIES; FRATERNITIES; LIBRARIES. Property owned and used exclusively by educational institutions offering regular courses 6 months in the year; or by churches or religious, educational or benevolent associations, including benevolent nursing homes and retirement homes for the aged, and also including property owned and used for housing for pastors and their ordained assistants, members of religious orders and communities, and ordained teachers, whether or not contiguous to and a part of other property owned and used by such associations or churches; or by women's clubs; or by domestic, incorporated historical societies; or by domestic, incorporated, free public library associations; or by fraternal societies operating under the lodge system (except university, college and high school fraternities and sororities), but not exceeding 10 acres of land necessary for location and convenience of buildings while such property is not used for profit. Property owned by churches or religious associations necessary for location and convenience of buildings, used for educational purposes and not for profit, shall not be subject to the 10-acre limitation but shall be subject to a 30-acre limitation. Leasing a portion of such property to an organization which if it owned the property itself would be exempt from taxation under this section and which does not discriminate on the basis of race shall not render the property taxable, if all the leasehold income is used for maintenance."

379, 278 N.W.2d 814 (1979), hold that the burden of showing that property is exempt from taxation is on the one seeking the exemption. "To be entitled to tax exemption the taxpayer must bring himself within the exact terms of the exemption statute." That is not the circumstance here since the Lodge held the exemption by legislative declaration. Where the party presently holds an exemption by legislative declaration, the burden is on the Department to show improper discrimination allowing consequent revocation of the exemptions. Here, there is no evidence in the record that the burden was misplaced on the Lodge, but only the order to show cause language which appeared in the Department's notice to the Lodge and a statement of the Department's secretary taken out of context, which combined did not evidence a shift of the burden.

In its conclusions, the Department holds that the department of revenue and secretary of the Department are prohibited by the fourteenth amendment "from granting or recognizing state income tax exemptions under section 71.01(3)(a) Stats. or property tax exemptions under section 70.11(4) for the Independence Lodge, Free and Accepted Masons, because of its policies and practices which discriminate against persons of the black race." Further, since the Independence Lodge rented the facilities from Excelsior Masonic Temple Association, Excelsior was not entitled to the exemption for its property used by the Independence Lodge because it was not being used exclusively for exempt purposes.

The Independence Lodge, a Milwaukee Masonic Lodge of 580 members, has no black members. No black had, prior to the application of Dossett, applied for membership in the Lodge. Dossett was the only applicant to be rejected within the five years next preceding his recenttion on November 5, 1976. From 1969 through November 5, 1976, the Lodge had acted on only 46 petitions. The membership of the Lodge had declined from 1951

when it had 1,234 members to 580 at the time of the hearing. As the number of members declined, the percentage of rejections declined. In the 1940's, there was an 11.5 percent rejection rate, 12.4 percent in the 1950's, 3.8 percent in the 1960's and 0 percent in the 1970's through 1975.

Admission to the Masonic Lodge is governed by a detailed procedure. Applicants must be nominated upon their request by two members. Solicitation of new members by lodge members is not allowed. Applicants are interviewed by an investigation team, which reports to the "Masters Board." That board screens the applicants. The Lodge membership then secretly votes on the applicants. Members deposit a white ball in the ballot box if they favor an applicant's membership, or deposit a black cube if they are opposed. One black cube denies membership, although the master of the Lodge may call for a discretionary second ballot.

Dossett was sponsored by two members of the Lodge and was reported on favorably by his investigation team. In his petition, Dossett stated he had been a member of the Prince Hall Lodge and also this fact was reported in at least one of the investigating team's reports. The significance of the Prince Hall Masonry Lodge membership is that organization is made up of black members. It is an organization with historic origins in 1775.

Dossett's membership was recommended by the Masters Board. There were five applicants being considered for membership the night Dossett's petition was voted on. At the vote one or more black cubes were cast against the first applicant. A second ballot was called, with the master announcing that a mistake had been made because both the applicant's father and uncle were Masons. No black cubes were cast on the second ballot. No black cubes were cast against the other three applicants. Black cubes were cast against Dossett on both votes.

The record is clear the membership knew Dossett was black when they voted on his petition. Thomas Palleon, the Worshipful Master of the Independence Lodge, denied reading Dossett's membership petition before the vote; however, he stated he had read it to the attending membership at the October 1 meeting with the vote being taken at the November 5 meeting. A reading of the petition would have informed the Lodge membership of Dossett's previous Prince Hall Lodge affiliation. Here, reading Dossett's petition, which referred to his prior membership in Prince Hall, identified him as being black. Attorney Edward H. Snyder testified that Master Palleon read Dossett's petition before the vote referring to his past Prince Hall affiliation. Carl D. Huth also testified that before the vote Dossett's petition was read, including the information as to his prior Prince Hall membership. Whether it was read the night of the vote or not was not controlling since Dossett was present that night and his appearance left no doubt as to his race.

The Masonic code requires that every applicant be sponsored by two members of the Lodge, receive the approval of the three-member investigating team and the approval of the Masters Board. These requirements were condemned as discriminatory by a finding of the Department. However, Dossett satisfied these requirements. The record shows that if there was discrimination, the only possible discriminatory act was the casting of the black cube at the vote meeting. Yet, the Department did not find that by itself to be discriminatory, but only when combined with the requirements which Dossett passed with approval at every step but the vote.

There was testimony at the hearing by Edward Snyder, a member of the Lodge and cosigner of the complaint to the Department, that he had placed a resolution before the Independence Lodge at a previous time recognizing the legitimacy of the Prince Hall Lodge. The

resolution was to be sent to the Grand Lodge to recognize Prince Hall Lodge. At first, he could not obtain a second to his motion; however, Thomas Palleon did second it. When the vote was cast for its acceptance, two votes were cast in its favor and the remainder opposed.

According to Edward Snyder's testimony, Prince Hall Lodge is in Masonry as a legitimate organization and not a clandestine organization, but it is not a recognized lodge. On September 11, 1979, George R. Hughey, Grand Master of the Grand Lodge of Wisconsin, by letter, directed to M.W. Arthur Meyers, Grand Master, Most Worshipful Prince Hall Grand Lodge F. & A.M. of Wisconsin, Inc., inviting each constituent Prince Hall Lodge in good standing the opportunity to become a chartered lodge under the Grand Lodge F. & A.M. of Wisconsin. However, that act was in 1979 and Dossett was rejected in his desire for membership in 1976.

There were 28 men in attendance the night Dossett's membership was considered. Two were ineligible to vote and one abstained. At least two black cubes were cast in Dossett's initial balloting. Carl Huth testified he cast one of those negative votes on the first ballot even though he was a member of the investigation team which reported favorably on Dossett's membership. He cast a black cube on the first vote because one of Dossett's sponsors had campaigned for his membership. The Masonic code prohibits politicking or campaigning only for any lodge office. There is, however, a non-code reason for prohibiting campaigning for a petitioner's membership application, and that is, campaigning dilutes the concept the candidate is making his petition of his own free will and accord. Huth testified that one of Dossett's sponsor's campaign efforts were the worst he has ever known and were offensive to the point of his rejecting Dossett as a member, which is why he cast the black cube.

The master called for a second vote which he may do if he believes a mistake was made. On the second vote, Huth stated he changed his vote to a white ball. He stated he would not have changed his vote were it not for the master's request for a second vote. Huth stated Masonry is an autocratic organization where the master, by his tone of voice and choice of words, signals his desire for approval of the petitioner. As a direct result, Huth "demurred to the knowledge and strength" of the master and said he dismissed his objections from his mind and cast a white ball on the second vote.

Thomas Palleon, the master, testified he cast a black cube on the first vote on Dossett's membership but changed it to a white ball on the second. He testified he cast the black cube initially since he was "worked up about the politicking" for Dossett by one of his sponsors who had contacted him about twenty times between Dossett's petition and the vote. On the second vote, he reconsidered his position in favor of Dossett and stated he cast a white ball.

Harvey Krueger was chairman of the Masters Board. He testified he also was disturbed by the sponsor's politicking which was zealous. He was not present at the vote but was present when the Masters Board reviewed Dossett's petition and approved it.

William Rohrer testified he investigated Dossett's petition along with Carl Huth and Donald Zlab and at the vote cast a white ball.

Donald Zlab testified he investigated Dossett's petition and considered him a worthy candidate for membership and had cast a white ball on both ballots.

There was no direct evidence that the black cube or cubes were cast because of Dossett's race. Rarely is racial discrimination subject to direct proof. "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Teamsters v. United States,* 431 U.S. 324,

335 n. 15 (1977). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . ." *Washington v. Davis,* 426 U.S. 229, 242 (1976).

The Lodge argues that members who voted may have had knowledge of Dossett's sponsor's improper politicking. However, the only proof is that Palleon testified he talked to Huth and Rohrer about it. Palleon and Huth admitted to casting black cubes on the first vote but white balls on the second vote after the Master Palleon called for the second vote. Rohrer, in spite of the knowledge of politicking, cast white balls on both votes. Harvey Krueger knew of the politicking but was not present at the vote. Donald Zlab had no knowledge of the politicking.

There is no evidence that any of the other members voting that night knew of the sponsor's improper politicking causing them to cast a black cube.

The Lodge, also through its attorneys' investigation conducted after the vote, discovered potentially negative factors as to Dossett's acceptability as a candidate; however, there is no proof any of those factors were known by any of the members voting on November 5, 1976. Edward Snyder testified that to his knowledge no such investigation had ever been done after the vote since he had been associated with Masonry since 1958.

■

The record shows that Dossett's petition for membership was properly received with two member sponsors; it received approval of the three-member investigating team, and he was recommended for membership by the Masters Board. The master called for a second vote indicating a mistake had been made and deference to the master on such ruling was noted in the record. In spite of all of this favorable reporting on his membership, at least two black cubes were cast on the second vote. There can be no other reasonably acceptable infer-

ence than the members casting such black cubes did so on the basis of Dossett's race. There were no factors before the membership which would have called for rejection of Dossett unless the casters of the black cube considered his race a disqualifying factor. This racial discrimination by members, even though only a small number, reflects on the organization and the group is bound by the unconstitutional acts of the few. Because of the single negative vote procedure present here allowing for independent arbitrary action, the onus of discrimination of the few is placed on the entire organization. This discrimination eliminates the organization from preferential tax treatment and exemptions by government.

We do not hold that the potential of denial of membership in an organization by the casting of black cubes by itself is unconstitutional since that method is different in form only from casting a no vote on a secret ballot. There may very well be legitimate grounds for a negative vote being cast against one seeking membership. However, when race appears to be or is suspected to be the reason for a negative vote or votes, there must be another acceptable reason or reasons for a negative vote directed toward the individual. Here, there were no other acceptable reasons demonstrated in the record for the black cubes on the second vote. The voting membership present was known and the attendance list has been filed in the record. Even though the Lodge did not have the burden of proving tax exemption entitlement, it did have the opportunity to call witnesses, especially those who cast the black cubes on the second vote giving them an opportunity to state their reasons other than race for rejecting Dossett's membership if they were aware of any such reasons. Race cannot be a reason for rejection.

The Grand Lodge's constitution requires that every petition for membership in a constituent lodge shall be received and acted on without regard to the race, color or

creed of the petitioner. It is considered un-Masonic conduct to cast a black cube in a membership vote for copious, sinister or unworthy motives. Those are the principles of the organization, but the group must guarantee not only that its constitution is complied with but also that the constitution of the United States is obeyed if it seeks governmental support through tax exemption.

Even without the *Pitts* decision, it is obvious that an organization receiving governmental support in the form of tax exemptions may not discriminate in membership based on race. The Department was empowered to determine the entitlement of the Lodge to maintain tax exemptions and the Department was charged to so review exemptions by order of the *Pitts* judgment. This record demonstrates that the only reasonable explanation for the black cubes rejecting Dossett's membership was based on his race and therefore the Department was required to deny the continuation of the tax exemptions of the Independence Lodge No. 8, Free and Accepted Masons and Excelsior Masonic Temple Association. The action of the Department was not arbitrary, oppressive or unreasonable and represented its judgment not its will, since there was substantial evidence in the record which would lead reasonable minds to the same conclusion reached by the Department.

*By the Court.*—The decision of the court of appeals is affirmed.

DAY and CALLOW, JJ., took no part.