HANNAH ROSENTHAL, Chairperson Adolescent Pregnancy PreventionServices Board
You indicate that the Adolescent Pregnancy Prevention Services Board awards grant monies from a sum certain account pursuant to section 46.93 (2), Stats., and that in 1986, the first year in which grants were issued, $803,900 in grant monies was issued to thirteen of twenty-six applicants. Approximately five of these applicants had religious ties, and two of them were successful in obtaining grants in excess of $80,000 each. One of these organizations conducts its activities in a parochial school because it needs classroom and related space, and no rental charge is made by the parochial school for that space. The other organization with religious ties also apparently has conducted a number of its funded activities in parochial schools. In addition, several board-funded organizations that do not have religious ties have contacted church or church youth groups and have conducted programs for those groups in churches. Individuals conducting such programs have been paid with board funds, but no governmental funds have been paid to the churches themselves. Based upon my examination of the grant applications filed by the two organizations with religious ties for the period prior to this fiscal year, my understanding is that the majority of the activities conducted by each grantee involve counseling, teaching and instruction of adolescents on matters related to premarital sex and premarital pregnancy. You also indicate that more organizations with religious ties have applied for grant monies for the 1987-88 fiscal year, but that only one organization with religious ties ranks sufficiently high to receive such funding.
Because program activities have been conducted in sectarian facilities, you state that, based upon 75 Op. Att'y Gen. 251 (1986), the board has or intends to place certain restrictions on the award of grant monies, and that the board is concerned that such grant monies be awarded and used in a constitutional fashion. You then, in effect, ask three questions concerning the award and handling of *Page 234 
funds administered by the board. For the sake of simplicity, I will address your questions out of order. The first question I will address is as follows:
 May any of the following entities receive funding from the . . . Board either as a grantee or under a subcontract with a grantee:
a. Churches, synagogues, or other religious organizations?
 b. Religious service organizations, i.e. Catholic Social Services, Jewish Social Services, Lutheran Social Services?
c. Parochial schools?
 d. Religious youth organizations, i.e. Young Life, B'nai B'rith Youth Organization, church youth groups?
I am of the opinion that neither direct nor indirect funding may be given to any pervasively sectarian organization or to any other organization that engages in a specifically religious activity in connection with the provision of referral, teaching and counseling concerning matters related to premarital sex and premarital pregnancy.
As amended by section 863br of 1987 Wisconsin Act 27, which has been partially vetoed by the Governor, section 46.93 provides in part as follows:
 Adolescent pregnancy prevention programs and pregnancy services. (1) LEGISLATIVE FINDINGS. The legislature finds that the 1,100,000 annual unintended or unwanted adolescent pregnancies in the United States, as estimated by the federal national center for health statistics, is a tragic and undesirable consequence of complex societal problems. The legislature recognizes that there is a lack of adequate health care, education, counseling and vocational training for adolescents which may provide positive options to adolescents in the area of pregnancy and parenting. To reduce the incidence, and adverse consequences, of adolescent pregnancy, the legislature finds that adolescent pregnancy prevention programs and pregnancy services are essential to encourage and implement community programs which address the complex societal problems facing adolescents and provide positive options to adolescent pregnancy.
. . . .
 (2) PURPOSE; ALLOCATION. From the appropriation under s. 20.434 (1)(b), the board shall review and either approve *Page 235 
 for award or disapprove grant applications from applying organizations to provide for adolescent pregnancy prevention programs or pregnancy services that include health care, education, counseling and vocational training. Types of services and programs that are eligible for grants include all of the following:
(a) Adolescent health clinics located in schools.
 (b) A statewide communications media campaign to discourage adolescent sexual activity and encourage the assumption of responsibility by adolescents, including male adolescent responsibility, for their sexual activity and for parenting.
(c) Adoption counseling for adolescents.
(d) Residential facilities for pregnant adolescents.
(e) Adult role model programs for adolescents.
 (3m) LIMITATIONS ON GRANT AWARD AND USE. The board in awarding grants under sub. (3) may not disapprove an application from an applying organization solely because the applying organization has a religious affirmation. The following activities are prohibited under any grant award under sub. (3):
(a) The singing [of hymns]* or reading of prayers.
 [(b) The existence of religious symbols in the physical surroundings within which activities under the grant are conducted.]*
 (b) The existence of restrictions, based on religion or absence of religion, on persons applying for or receiving services under the grant.
 (c) The supplying or promotion of written material that has a religious context.
[(c) Any other activity having a religious purpose.]*
. . . .
 (4) PROHIBITED USES OF FUNDS. Funds received by an organization under a grant awarded under this section may not be used for any of the following:
 (a) Purchasing or dispensing contraceptives in adolescent health clinics located in schools.
(b) Providing abortions. *Page 236 
 (c) Advertising abortion services in a statewide communications media campaign.
The provisions added by the Legislature in the budget bill are underscored, while the provisions vetoed by the Governor are lined out.
In construing this statute, I am guided by the fundamental principle that "[a]ll statutes are presumed constitutional and will be held to be so unless proven otherwise beyond a reasonable doubt . . . ." State ex rel. Ft. How. Paper v. Lake Dist. Bd.,82 Wis.2d 491, 505, 263 N.W.2d 178 (1978). If possible, I must also "avoid construing a statute in such a way as would render that statute unconstitutional." United States Fire Ins. Co. v. E.D.Wesley Co., 105 Wis.2d 305, 319, 313 N.W.2d 833 (1982). These principles and their importance are described in detail inTreiber v. Knoll, 135 Wis.2d 58, 64-65, 398 N.W.2d 756 (1987), quoting State ex rel. Hammermill Paper Co. v. La Plante,58 Wis.2d 32, 46, 205 N.W.2d 784 (1973) and State ex rel. Carnation MilkProducts Co. v. Emery, 178 Wis. 147, 160, 189 N.W. 564 (1922).Also see State ex rel. Unnamed Petitioners v. Connors,136 Wis.2d 118, 120-21 n. 2, 401 N.W.2d 782 (1987).
The first amendment to the United States Constitution provides in part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." This provision applies to the states through thefourteenth amendment. See Cantwell v. State of Connecticut, 310 U.S. 296
(1940). A similar prohibition is contained in article I, section18 of the Wisconsin Constitution which provides as follows: "[N]or shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries." Both constitutional provisions serve the same dual purpose of prohibiting the "establishment" of religion. State ex rel. Wis.Health Fac. Auth. v. Lindner, 91 Wis.2d 145, 163, 280 N.W.2d 773
(1979).
Governmental funding to religious organizations is constitutionally permissible only if the statutory funding scheme passes muster under each part of a three-part test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . finally, the statute must not foster `an excessive government entanglement with religion' [citations omitted]." Lemon v. Kurtzman, 403 U.S. 602, *Page 237 
612 (1971). The Wisconsin Supreme Court has adopted this three-part test for the purposes of state constitutional analysis. State ex rel. Warren v. Nusbaum, 64 Wis.2d 314,219 N.W.2d 577 (1974). Although it has never been held to be dispositive, Lynch v. Donnelly, 465 U.S. 668, 689 (1984) (O'Connor, J., concurring), a fourth factor which must be considered is the degree of political divisiveness fostered by the statutory scheme. See Committee for Public Ed. ReligiousLib. v. Nyquist, 413 U.S. 756, 794-98 (1973); Lindner,91 Wis.2d at 162.
The statutory funding scheme originally adopted by a unanimous Legislature consists of a competition for grant monies, with the proviso that the funds cannot be used to provide abortions, to advertise abortion services statewide or to purchase or dispense contraceptives in health clinics in schools. The stated purpose of this statutory scheme is detailed in depth in 1985 Wisconsin Act 56, sec. 2:
 Legislative findings. (1) The legislature finds that the high number of unintended or unwanted pregnancies and the resultant high number of abortions is a tragic and undesirable consequence of complex societal problems. Strong efforts must be made to ensure that unintended pregnancies do not become unwanted pregnancies. Strong efforts also must be made to reduce the number of unintended pregnancies and to promote programs that enhance the use of options other than abortion. The legislature finds that a multifaceted approach to reducing abortions is necessary and desirable and must involve not only private and public institutions and agencies but, more important, families. Health care providers, public and private schools, social service agencies, community and volunteer groups and members of the clergy must work with families and develop programs to promote constructive life values and responsible behavior, with emphasis on educating and counseling adolescents.
 (2) The legislature finds that programs must be made available to assist adolescents in acquiring decision-making skills, enhancing their self-esteem, learning responsible behavior and realizing their full potential. The legislature believes that prevention of unintended pregnancies among adolescents will increase the possibility that adolescents will obtain necessary living skills prior to having children. *Page 238 
 (3) The legislature believes that adolescents should be encouraged to take responsibility for the consequences of their actions. It is clear that among adolescents the burden of unwanted pregnancies presently is borne by the adolescent mothers and that ways must be found for adolescent fathers, as well as the parents of adolescents, to share in this responsibility. During pregnancy and after pregnancy, adolescent parents should be informed on how to keep themselves and their babies healthy and should be given the skills needed to achieve economic self-sufficiency. The legislature further finds that there is a need for increased awareness, especially among adolescents, of the availability of adoption as a potential alternative to abortion.
 (4) The legislature finds that while this act carries a state financial commitment, that commitment will be repaid many times in economic, social and human terms.[1]
As was the case in Kendrick, 657 F SUPP. at 1557-58, the Legislature's statement of purpose makes specific reference to solving the problems created by the "1,100,000 annual unintended or unwanted adolescent pregnancies in the United States . . . ." Sec. 46.93, Stats. Given this statement, I have no hesitation in concluding that section 46.93 has a valid, laudable secular legislative purpose *Page 239 
pose of curbing the societal problems caused by unwanted teenage pregnancies.
I next must examine whether section 46.93 has a primary effect which advances religion. A statute may have more than one primary effect. Nyquist, 413 U.S. at 783 n. 39. If one such primary effect is the advancement of religion, then the statute is constitutionally infirm. Id. "Aid may normally be thought of as having the primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." Nusbaum,64 Wis.2d at 325. See Hunt v. McNair, 413 U.S. 734, 743 (1973). The intentional or inadvertent inculcation of religious beliefs is absolutely prohibited. Grand Rapids School Dist. v. Ball,473 U.S. 373, 105 S.Ct. 3216, 3223-24 (1985). In addition, governmental funds cannot be used to subsidize "the primary religious mission" of an institution. Ball, 105 S.Ct. at 3226. And where adolescents are involved, the perception that the powers of government have been enlisted to support a religious denomination must be avoided. Ball, 105 S.Ct. at 3223-24. If possible, a limiting construction of the statute must be employed in order to avoid any of these results. Cf. Broadrick v.Oklahoma, 413 U.S. 601, 613 (1973).
Applying the presumption of constitutionality, and given my obligation to construe the statute so as to avoid an unconstitutional result, I cannot say beyond a reasonable doubt that no such limiting construction is possible. First, the overall purpose of section 46.93 is religiously neutral and unquestionably legitimately secular. An establishment clause issue arises only on a limited number of occasions when the board is asked to approve grants to applicants possessing specific characteristics. Second, the statutory amendments recently enacted by the Legislature in the budget bill now specifically prohibit prayer reading or singing as well as the distribution or promotion of written religious material. Third, the Governor's veto message at 93-94 makes it clear that his purpose was solely to veto language more restrictive than constitutionally required:
 While several of the prohibited activities contained in this section are necessary to ensure that the grant program comports with the Establishment Clause of the First Amendment, I have *Page 240 
vetoed those sections or parts of sections that are potentially more restrictive than Establishment Clause jurisprudence would suggest.
 In order to pass muster under the Establishment Clause, an aid program must: (a) have a secular purpose, (b) have a primary effect that neither advances nor inhibits religion, and (c) avoid excessive entanglement between government and religion. When determining whether an assistance program passes this test, it is valuable to determine whether the institutions receiving assistance have independently secular functions that the State may assist without directly aiding religious activities.
 Accordingly, I have vetoed those provisions which have the potential to exclude those institutions which, although affiliated with a religious institution, may serve independently secular functions of valuable benefit to their communities and the state. I believe subsections (b) and (e), and a portion of subsection (a), sweep too broadly in this regard.
Thus, the phrase "of hymns" in section 46.93 (3m)(a) was apparently vetoed so that the singing of secular songs which are also hymns would not be prohibited. Compare Marsh v. Chambers,463 U.S. 783, 792-93 (1983). Similarly, the language relating to the presence of religious symbols was apparently vetoed because the mere presence or existence of religious symbols somewhere in a structure where funded activities occur does not necessarily create a symbolic link between church and state. Finally, an individual instructor may have a religious purpose or motive in providing referral, teaching or counseling in matters related to premarital sex and premarital pregnancy, but such a purpose does not automatically render the funding of those activities constitutionally infirm.[2]
Since it is limited to situations involving religiously affiliated institutions that "serve independently secular functions of valuable *Page 241 
benefit to their communities and the state[,]" the Governor's veto message presupposes that pervasively sectarian organizations are constitutionally ineligible for funding and that any religious activities engaged in by secular organizations also may not constitutionally be funded. This construction may properly be considered as a part of the legislative history of the statute.See 76 Op. Att'y Gen. 173 (1987); State ex rel. Kleczka v. Conta,82 Wis.2d 679, 708-09, 264 N.W.2d 539 (1978). Under the United States Supreme Court's holding in Hunt, 413 U.S. at 743, and the Wisconsin Supreme Court's holding in Nusbaum, 64 Wis.2d at 325, it is my opinion that the narrowing construction employed by the Governor in his veto message is constitutionally required. Given this narrowing construction of the statute, it is my opinion that section 46.93 does not have a primary effect of advancing religion.
I next must examine whether the statute fosters an excessive governmental entanglement with religion. In doing so, I cannot ignore the possibility that someone might argue that the narrowing construction of section 46.93 which I have adopted with respect to the funding of pervasively sectarian organizations could be avoided if the board were to monitor the activities of those organizations. In determining whether excessive entanglement would exist, the factors to be considered are "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority."Lemon, 403 U.S. at 615. Given the kinds of activities which are funded by the board, such monitoring would result in an impermissible entanglement between government and those kinds of religious organizations:
 A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that . . . the First Amendment . . . [is] respected. Unlike a book, a teacher cannot be inspected once so as to determine the extent and intent of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church.
Lemon, 403 U.S. at 619.
It is worth noting that the current Chief Justice of the United States Supreme Court, in criticizing the Court's prior decisions in *Page 242 
this area, has stated that the Court routinely "takes advantage of the `Catch-22' paradox of its own creation . . . whereby aid must be supervised to ensure no entanglement but the supervision itself is held to cause an entanglement." Aguilar v. Felton,473 U.S. 402, 105 S.Ct. 3232, 3243 (1985) (Rehnquist, J., dissenting). Lindner also indicates that it is more likely that constitutional problems can be avoided if day-to-day supervision of pervasively sectarian organizations can be minimized or eliminated. But that ordinarily can be done only with respect to content-neutral activities where the use of funding "can be ascertained in advance and cannot be diverted to sectarian uses."Wolman v. Walter, 433 U.S. 229, 251 n. 17 (1977). Since pregnancy referral, teaching and counseling activities are not necessarily content neutral I conclude that excessive governmental entanglement would result if grants were given to pervasively sectarian organizations to perform such services.
The same constitutional problems do not obtain with respect to the monitoring of secular organizations so as to ensure that they do not conduct religious activities in connection with the provision of pregnancy referral, teaching or counseling services pursuant to a grant from the board. Nevertheless, in State exrel. Warren v. Nusbaum, 55 Wis.2d 316, 332, 198 N.W.2d 650
(1972), the court held that, even though the Marquette Dental School performed an entirely secular function
 it would appear advisable that the statute require and the contract provide that . . . students, [not] . . . be required to take religious instruction or courses of a religious nature as a prerequisite to their undertaking or completing their education . . . . Even th[is] peripheral matter . . . ought to be brought into line with the completely secular policies established and maintained for the admission and graduation of . . . students in order to make clear the entirely secular nature of all aspects of the . . . operation.
(Emphasis and bracketed material supplied). Such a contractual type of grant restriction would also help minimize the need to monitor secular organizations.
The determination as to whether a particular applicant is eligible for funding "is to be made with regard to the entire context in which the institution operates." Lindner,91 Wis.2d at 158. In making such determinations with respect to organizations with religious *Page 243 
ties, the board is required to engage in a two-step analysis. First, it must determine whether the applicant is ineligible because it is pervasively sectarian. If the applicant is not pervasively sectarian, the board then must determine whether the applicant will be conducting a specifically religious activity in connection with the provision of referral, teaching and counseling pursuant to a grant made by the board.
A pervasively sectarian organization is one in which "a substantial portion of its functions are subsumed in the religious mission . . . ." Nusbaum, 64 Wis.2d at 325. Elementary and secondary parochial schools have been held to be pervasively religious in character. See Meek, 421 U.S. at 366; Lemon,403 U.S. at 615. It follows, almost by definition, that a church or synagogue is pervasively sectarian. Although no church-affiliated colleges appear to be grant applicants, the case law relating to them is instructive. It is noteworthy that some of these colleges are pervasively sectarian while others are not. In general, such colleges that make no attempt to indoctrinate students through teaching or required attendance at religious services have a predominantly secular function of providing higher education.Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 762
(1976); Tilton v. Richardson, 403 U.S. 672, 685-89 (1971). But many factors have been considered in making such determinations, including the stated purpose of the college; the degree of religious control over the governing board; the extent of ownership, financial assistance, and affirmation by or with the sponsoring church; the place of religion in the college's program; the occupation and other activities of alumni; and the work and image of the college in the community. See Horace MannLeague v. Board of Public Works, 242 Md. 645, 220 A.2d 51, 65,cert. den., 385 U.S. 97 (1966)
With respect to social service organizations, religious youth groups or other applicants that have organizational ties to a particular religious faith, you may wish to develop a detailed questionnaire examining some of these factors, and may also wish to require the submission of incorporation papers, bylaws, resolutions or relevant policy statements. In Bradfeld v.Roberts, 175 U.S. 291 (1899) the Supreme Court held that it was permissible to give aid to a corporation which was owned and operated entirely by members of a religious order because the organization was limited by its corporate charter to the secular purpose of operating a charitable hospital *Page 244 
open to persons of all religious beliefs.[3] The submission made by the organization must ordinarily be accepted at face value, but the board can require as much detailed information as it sees fit in determining whether a substantial portion of the applicant's functions are subsumed in the religious mission. SeeHoly Trinity Community School v. Kahl, 82 Wis.2d 139, 149-50,262 N.W.2d 210 (1978). Such a finding and determination should be made as to each applicant with religious ties.
Once the board is satisfied that the applicant is not a pervasively sectarian organization, it then must determine whether the applicant will be conducting a specifically religious activity in connection with the provision of referral, teaching and counseling pursuant to a grant made by the board. In this regard, some of the same information used to determine whether the applicant is pervasively sectarian may be useful. In addition, information should be sought as to whether the applicant will confine itself to the presentation of psychiatric, humanitarian, sociological, health or other nonreligious reasons in connection with such items as the advisability of premarital sexual activities and abortion. An unequivocal statement should also be obtained as to whether adolescents will or will not be instructed according to doctrine adhered to by the religious organization with which the grant applicant is affiliated. If the applicant represents that no such religious activities will be conducted, the grant should incorporate that restriction and should provide that violation of that restriction constitutes grounds for termination of the grant and recovery of funds previously paid. This two-step process should avoid any possibility of unconstitutional administrative entanglement after grants are issued.
With respect to the fourth factor I must consider, a greater risk of political divisiveness exists where the statutorily prescribed funding mechanism permits organizations with religious ties to compete annually for grants. Meek v. Pittenger, 421 U.S. 349,372 (1975). The problem is that continuing annual appropriations generate increasing demands as costs and population grow. Nyquist, *Page 245 413 U.S. at 797-98. The danger perceived by the courts in such a funding mechanism is that religious groups with the power to employ political machinery in furtherance of their own interests are likely to receive a disproportionate share of such grants.Cf. Engel v. Vitale, 370 U.S. 421, 426-27, 429 (1962); Everson v.Board of Education of Ewing Tp., 330 U.S. 1, 15 (1947). Although this factor is not dispositive, special care must be taken to avoid constitutional violations when such a funding mechanism is selected. See Lemon, 403 U.S. at 622-24.
Evaluating all of these factors, I find no constitutional infirmity in awarding grants to organizations that are not pervasively religious in character, provided that such organizations do not engage in specifically religious activities in connection with activities conducted pursuant to the receipt of such grants. I note that "it does not follow that a statute violates the Establishment Clause because it `happens to coincide or harmonize with the tenets of some or all religions.'" Harrisv. McCrae, 448 U.S. 297, 319 (1980). I am therefore determining that section 46.93 is constitutional, but I am also construing it so as to avoid an unconstitutional result. I conclude only that the board would violate the establishment clause by issuing grants to pervasively sectarian organizations or to any other organization that engages in a specifically religious activity in connection with the provision of pregnancy referral, teaching or counseling services to adolescents. As stated in Nusbaum,64 Wis.2d at 325, quoting Tilton v. Richardson, 403 U.S. at 682: "Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics." Therefore, I also express no opinion as to whether any particular grant recipient or applicant falls within the scope of this prohibition since that is a factual determination which must be made by the board through the application process. See 68 Op. Att'y Gen. 416, 421 (1979).
My conclusion is based upon the nature of these activities and does not necessarily apply to other activities that could be funded under section 46.93 or any other statute. The potential constitutional infirmity exists and a limiting construction of the statute is therefore required because most pervasively religious organizations hold moral views with respect to premarital sexual relations and other related topics. The constitutional danger is that the state may *Page 246 
provide funding to a pervasively sectarian organization or a secular affiliate which funding could then be used, either intentionally or unintentionally, to inculcate the moral views of the pervasively sectarian organization on these subjects. With respect to grant monies given to pervasively sectarian organizations or their secular affiliates for other purposes, a specific analysis of the activity funded would be required. Therefore, nothing said here is intended to address or implicate the legality of providing state aid to pervasively sectarian organizations or their secular affiliates for purposes other than pregnancy care and prevention services involving referral, teaching and counseling.
I next address the following inquiry:
 May funding provided by the . . Board be used to provide program services in a building housing a church/synagogue or other place of worship? If yes, under what circumstances?
I am of the opinion that an organization which satisfies the criteria mentioned in response to your first question ordinarily may not provide pregnancy referral, teaching and counseling services to adolescents in a building housing a place of worship, a parochial school or any other facility actively used for a pervasively sectarian purpose, even if no religious activities are conducted and all religious artifacts or symbols are removed or covered in those areas where program services are provided.
Since I have already indicated that funding may not constitutionally be provided by the board to pervasively sectarian organizations, the principal constitutional danger in funding program services provided in a building housing a facility actively used for a pervasively sectarian purpose is that a "crucial symbolic link . . . at least in the eyes of impressionable youngsters" between church and state will be created or perceived. Ball, 105 S.Ct. at 3223-24. AS previously explained in response to your first inquiry, if at all possible a narrowing construction of section 46.93 must be employed in order to avoid such an unconstitutional result.
I am aware that "the use of a church facility by a state agency is not per se a violation of the Fi[rst] Amendment." Lemke v.Black, 376 F. Supp. 87, 89 (E.D. Wis. 1974), vacated andremanded, 525 F.2d 694 (7th Cir. 1975). On the other hand, the establishment clause clearly prohibits the locating of publicly funded classes in rooms with religious symbols and other religious decorations. See *Page 247 Lemon, 403 U.S. at 615. The Supreme Court's recent decision inBall indicates that buildings housing facilities actively used for a pervasively sectarian purpose ordinarily possess significant symbolic overtones in circumstances involving the teaching or counseling of adolescents.
In Ball, 105 S.Ct. at 1318-20, the Court refused to permit public funding of a "Community Education" program involving classes taught on parochial school premises after normal parochial school hours by part-time public school employes that were usually also full-time parochial school employes. Cases interpreting Ball have held that "symbolic impact" depends upon "the location and timing of the classes as well as the tender and impressionable ages of the children who are, one way or another, whether or not participants, in contact with the program." Fordv. Manuel, 629 F. Supp. 771, 777, 779 (N.D. Ohio 1985). See alsoParents Ass'n of P.S. 16 v. Quinones, 803 F.2d 1235, 1241-42 (2nd Cir. 1986).
Cases decided prior to Ball use similar tests. In Decker v.O'Donnell, 661 F.2d 598 (7th Cir. 1980), the court invalidated the use of Comprehensive Employment Training Act ("CETA") funding for employes of parochial schools. Relying upon Meek, 421 U.S. 349, a case in which the Supreme Court struck down the provision of therapeutic services by public school employes on the premises of parochial schools, the seventh circuit held that the "outstationing" of governmentally employed CETA workers in parochial schools for the purposes of providing remedial educational services was constitutionally prohibited. Decker,661 F.2d at 610. In addition, the court held that the provision of nursing services by CETA employes was constitutionally impermissible because the "nursing services permitted do not exclude services treating high school children on matters of sexuality, sexual hygiene, and mental health." Decker,661 F.2d at 613.
Decker, 661 F.2d at 607, tends to indicate that state funding of secular teaching or counseling services performed in facilities such as parochial schools is ordinarily constitutionally prohibited because the elementary and secondary schools involved are pervasively sectarian. Somewhat the same standard was employed in Moore v. Board of Education,4 Ohio Misc. 257, 212 N.E.2d 833 (1965) where the court indicated that the test is whether by using such facilities a symbolic link is created or perceived "[i]n the eyes of the pupils — impressionable children." Similarly, in Stark v. St. *Page 248 Cloud State University, 604 F. Supp. 1555, 1561 n. 8 (D. Minn. 1985), the court concluded that "the parochial schools utilized . . . fit precisely the `pervasively sectarian' description in Lemon." That is also true with respect to buildings housing places of worship or other facilities actively used for pervasively sectarian purposes.
There may be rare situations involving the use of segregated areas such as basements, vacant buildings or areas with separate entrances where the use of church, parochial school or similar space to conduct referral, counseling and teaching activities is analagous to the lease arrangements approved in 75 Op. Att'y Gen. 265 (1986) and State ex rel. Sch. Dist. v. Nebraska State Bd. ofEd., 188 Neb. 89, 195 N.W.2d 161, cert. den., 409 U.S. 921
(1972). But caution is warranted since the subject matter of the activity for which funding is received carries religious or moral overtones. Given the nature of the clientele served, there is a strong likelihood that a crucial symbolic link between government and religion would be created or perceived where a state-funded program to refer, counsel or teach adolescents on personal moral choices respecting pre-marital sex, pregnancy and abortion is conducted in a building housing a facility actively employed for a pervasively sectarian purpose.
Finally, you note that, based upon the advice given by my predecessor in 75 Op. Att'y Gen. 251 (1986), the executive committee of the board has decided to recommend that the following conditions or restrictions be placed upon the use or acceptance of grant monies distributed by the board:
 1. Funding provided by the . . . Board may not be used to provide program services within a parochial school during regular school hours.
 2. Funding provided by the . . . Board may be used to provide program services within a parochial school after regular school hours, if the program is opened to all students regardless of race, religion, color, and national origin, and if all religious artifacts and symbols are removed or covered.
 3. Recruitment of participants for programs utilizing any funds provided by the . . . Board must be conducted on a community-wide basis, and cannot be self-selecting on the basis of religion, etc.
You therefore ask whether these restrictions on the use of grant monies issued by the board are legally required. In view of the fact *Page 249 
that I have already indicated that such activities can rarely be conducted in any facility actively employed for a pervasively sectarian purpose even when no services are conducted and all religious artifacts or symbols are removed or covered, I need only analyze whether the board's programs must be open to all students, whether recruitment can be "self-selecting" and whether community-wide recruitment is required.
I am of the opinion that programs funded by the board must be open to all students regardless of race, religion, color and national origin, and that it is desirable but not required that recruitment not be "self-selecting" and that community-wide recruitment occur.
Your principal concern may have been addressed by the enactment of section 46.93 (3m)(b) which now prohibits "[t]he existence of restrictions, based on religion or absence of religion, on persons applying for or receiving services under the grant." It is self-evident that to bar any adolescent from participation in a governmentally-funded activity based upon any of the other characteristics mentioned would constitute a violation of federal and state equal protection guarantees as well as various federal and state statutes prohibiting discrimination. See, e.g., Stateex rel. Palleon v. Musolf, 120 Wis.2d 545, 356 N.W.2d 487
(1984).
You have verbally indicated that the term "self-selection" refers to a process whereby a grantee contacts a church, parochial school or religious youth group and offers to provide counseling services to the adolescents who are members of the organization. Your concern is that, by contacting only certain religiously affiliated organizations and/or by failing to publicize the availability of scheduled programs on a community-wide basis, the grantee may intentionally or unintentionally limit participation in such publicly funded services to the members of a particular religious denomination or denominations, even though individuals that are not members of the religiously affiliated organization would not be prohibited from receiving such services if they had been made aware of their availability.
The statute contains no requirement that community-wide recruitment occur. If the availability of these programs is widely publicized by other grantees within the community, it may be that the failure of any particular grantee to publicize the availability of such services would cause no legal problem. But there is a possible *Page 250 
danger that, in practice, the activities of one or more grantees may favor members of a particular religion or religions with respect to the availability or provision of program services. Cf.Wilder v. Sugarman, 385 F. Supp. 1013, 1023 n. 16 (S.D.N.Y. 1974) (three-judge court). If so, claims of religious discrimination may result. Whether such religious discrimination would in fact occur depends upon the facts of each particular case. Thus, while I believe that community-wide recruitment is desirable in order to avoid any potential claims of religious discrimination, I cannot say that it is legally required.
In conclusion, the board may not constitutionally provide funding to pervasively sectarian organizations or to any other organization that engages in a specifically religious activity in connection with the provision of referral, teaching or counseling concerning matters related to premarital sex and premarital pregnancy. Such activities also ordinarily may not be conducted in a building housing a place of worship, a parochial school or any other facility actively used for a pervasively sectarian purpose, even if no services are conducted and all religious symbols or artifacts are covered or removed. Finally, discrimination on the basis of race, color, creed or national origin is not permissible, and community-wide recruitment is not necessarily required but may be desirable in order to avoid any possibility that religious discrimination with respect to the availability or provision of services might occur.
DJH:FTC
* [EDITORS' NOTE: THE TEXT CONTAINED WITHIN THE BRACKETS WAS STRICKEN THROUGH IN THE ORIGINAL TEXT.]
[1] The constitutionality of a federal statutory scheme with certain similarities to section 46.93 is analyzed in Kendrick v.Bowen, 657 F. Supp. 1547 (D.D.C. 1987). That case examined the constitutionality of the Adolescent Family Life Act ("AFLA"),42 U.S.C. §§ 300z through 300z-10 (1981), which provides for grants for demonstration projects to public or private non-profit organizations for the purpose of providing pregnancy care and prevention services. These services include maternity counseling, adoption and referral services, services to discourage adolescent sexual relations, counseling and family planning services.Kendrick, 657 F. Supp. at 1553. The federal statutory scheme is similar to the state statute in that both contain a funding mechanism which provides for competition for grant monies, and in that the legislative findings made by Congress are similar to those made by the Legislature in 1985 Wisconsin Act 56, sec. 2 and in section 46.93 (1). See 42 U.S.C. § 300z(a) (1981). The federal statutory scheme differs in that 42 U.S.C. § 300z-5
(a)(21) (1981) provides that an applicant for a grant must describe how it will involve religious organizations "as appropriate in the provision of services." An additional difference is that 42 U.S.C. § 300z-10 (1981) provides that grant monies generally cannot be used for any kind of abortion counseling or referral.
In Kendrick, 657 F. Supp. at 1553, the district court found the federal statutory scheme to be unconstitutional insofar as it permitted funding for activities involving or related to pregnancy "referral, teaching or counseling services" to be made to organizations with a religious character and purpose. The district court's decision was recently stayed by Chief Justice Rehnquist pending docketing of a timely appeal and the Supreme Court's ultimate disposition on the merits. Bowen v. Kendrick, No. A-99 (August 10 1987). Because the Kendrick case has not finally been resolved and more importantly, because of the key differences between the federal and state statutory schemes, as emphasized by the statutory amendment contained in the budget bill, I take note of but place no special reliance on Kendrick in this opinion.
[2] In Kendrick, 657 F. Supp. at 1563, it was inferred that the federal statutes endorsed the beliefs of those religions that advocate the preferability of adoption to abortion. Even though section 46.93 (4) prohibits the board from funding certain abortion-related activities, and even though adoption is specifically identified as a "potential alternative to abortion" in 1985 Wisconsin Act 56, sec. 2 (3), the inference drawn by the district court in Kendrick cannot be drawn here. Although 1985 Wisconsin Act 56, sec. 2 (1) states that "members of the clergy must work with families and programs to promote constructive life values and responsible behavior with emphasis on education and counseling adolescents," section 46.93 does not require that any religious organization receive grant monies. Section 46.93 (4) also does not prohibit funding for abortion counseling and referral.
[3] In Kendrick, 657 F. Supp. at 1565, the district court found organizations with "explicit or implicit corporate policies" that "prohibit any deviation from religious doctrine" to be pervasively religious in nature. I am not suggesting that an organization must teach or counsel in a manner contrary to the views of the religious entity with which it is affiliated But it is my opinion that an organization operated without reference to such doctrine ordinarily will not be considered to be pervasively sectarian. *Page 251